John Michael Hayes and Mildred L. Hayes v. Commissioner.
Hayes v. Commissioner
Docket No. 377-65.
United States Tax Court
T.C. Memo 1967-80; 1967 Tax Ct. Memo LEXIS 181; 26 T.C.M. (CCH) 393; T.C.M. (RIA) 67080; April 17, 1967
Earl C. Crouter, 458 S. Spring St., Los Angeles, Calif., for the petitioners. James J. Cotter, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies and additions to tax against the petitioners: Addition to tax
Taxable
Sec. 6651(a)
year
Deficiency
I.R.C. 1954
1960
$2,413.78
$482.76
1961
4,545.58
Four issues are presented for decision. They are: 1. Did respondent correctly disallow certain deductions for business expenses claimed by petitioner John Michael Hayes in the years 1960 and 1961 and include in his income *182 for those years certain reimbursements from employers for claimed travel expenses? 2. Are petitioners entitled to a deduction for charitable contributions in the year 1961 in excess of the amounts allowed by respondent? 3. Are the petitioners entitled to depreciate their breeding herd in excess of its adjusted basis as of January 1, 1960? 4. Was the failure of petitioners to file a timely income tax return for the year 1960 due to reasonable cause? Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. John Michael Hayes and Mildred L. Hayes (hereinafter called John and Mildred individually or petitioners collectively) are husband and wife who, at the time of filing the petition herein, were residents of Winter Harbor, Maine. They filed their joint Federal income tax returns for the years 1960 and 1961 with the district director of internal revenue at Los Angeles, California. John is a well-known independent professional writer who devotes most of his talents to screenplays and scenarios for various motion picture producers and professional companies. *183 He has written many screenplays, such as "Peyton Place," "Butterfield 8," "Sweet Bird of Youth," "The Chalk Garden," "The Children's Hour," "Imperial Venus," and "Lady L." During the years in question Mildred was a housewife who maintained the family residence in Winter Harbor, Maine, and sometimes traveled with John to his places of employment, including California. Petitioners and their three children have resided in Winter Harbor since 1959. Their home, constructed in 1892, is located in a summer resort area near the ocean and is in an isolated area, being 27 miles from the nearest city. This home has three floors, 14 rooms, and is situated on 12 acres of land. It was purchased by petitioners for $31,500. During the years 1960 and 1961 John had an office in one room in his residence which contained reference books, a desk, supplies, and various business machines. Another room contained the files of hundreds of radio dramas and motion picture scripts on which petitioner has worked during his career. He also has a library in his home of over 4,000 volumes which fill three other rooms. The library is needed to provide readily accessible background material for John's writing endeavors. *184 All five rooms are used by John for his basic research and in writing the first draft of screenplays or other material. In conjunction with his writing, the petitioner often entertained business guests at his residence. These guests usually stayed overnight since there were no public accommodations within 27 miles of petitioner's home. In 1960 and 1961 John rendered professional services to Columbia Pictures Corporation, Metro-Goldwyn-Mayer, Paramount Pictures Corporation, Universal Pictures Company, and Mirisch Company, Inc., all located in Los Angeles, California. In 1960, John was away from his residence in Maine approximately 4 months. In 1961, he spent about 7 1/2 months away from his Winter Harbor home, 5 1/2 of them in California working on a motion picture and the other 2 months in Rome working on another script. In their income tax return for 1960 the petitioners claimed $4,289.52 as "Business Contacts and Promotion" expenses. The amount was computed as follows: Percentage of
disbursements
Disbursements
claimed
Claimed
Various household expenses (including * depreciation of house & furniture)
$24,240.49
10%
$2,424.05
Restaurant charges
958.85
90%
862.97
Cash expenses
4,010.00
25%
1,002.50
Total
$29,209.34
$4,289.52 * Depreciation on house
$1,342.88 ( 4%)
furnishings
1,647.95 (10%)
Total
$2,990.83
Respondent disallowed $1,885.42 of the total amount claimed.
*185 In 1961 the petitioners claimed $4,786.86 as "Business Contacts and Promotion" expenses. This amount was arrived at in the following manner: Various household expenses
$10,504.91
Utilities
744.51
General insurance
429.03
Household salaries
3,162.50
Depreciation: House
1,342.88
Improvements
414.32
Furnishings
1,895.92
Food
$ 5,189.68
Total expenses
$23,683.75 Amount claimed on return: 10% of total expenses
$ 2,368.38
Restaurant charges (75%)
1,317.08
Cash expenses (25%)
1,101.40
Amount claimed
$ 4,786.86 Respondent disallowed $1,569.46 of the total amount ($4,786.86) claimed by petitioners. John did not claim some of his smaller business expenses, such as those for meals and tipping, on his expense accounts. However, restaurant charges and cash expenditures which he deducted in 1960 are, to some degree, duplicitous. His miscellaneous business expenses in 1961 were greater than those in 1960 because such expenses were higher in Europe than in the United States. In 1960 the petitioners claimed automobile expenditures of $2,177.74, of which sum they deducted 75 percent ($1,633.30) as business expenses. Respondent determined *186 that only 50 percent was for business purposes and therefore disallowed automobile expenses in the amount of $544.44. In 1961 the petitioners claimed automobile expenditures of $3,456.19, of which sum they deducted 75 percent ($2,592.14) as business expenses. Respondent determined that only 50 percent of such amount was for business purposes, and thus disallowed $864.05. Petitioners owned two cars during the years 1960 and 1961, and drove two cars both in Maine and California. John used one of the cars for various business purposes including trips to the airport, business trips to Boston, Massachusetts, and Bangor, Maine, which were 500 and 130 miles, respectively, from his residence, to meet professional speaking engagements in the New England area, and to secure business supplies. John was never reimbursed for these expenditures. John received $5,806.13 as travel reimbursements from his various employers in 1960. According to the general ledger account entitled "Travel Expense" which was kept by his accountants, he had travel expenses of $5,277.58 during that year, leaving an excess reimbursement of $528.55. Petitioners claimed "Travel Expenses" of $1,609.85 in 1961. Respondent *187 determined that an adjustment of $2,634.52 was proper. The following is respondent's determination of the disallowed expenses: 1961
Personal
Deductible
Expenses incurred
Total
portion
amount
Rent
$3,923.60
$ 980.90
$2,942.70
Cash (Mrs. Hayes)
250.00
250.00
0
Railroad fares
862.49
431.25
431.24
Car rental
213.69
107.00
106.69
L. J. Miron (unidentified)
603.12
603.12
0
A. Larrabee
36.00
0
36.00
Utilities
439.02
109.75
329.27
Miscellaneous
631.10
152.50
478.60
Cash (Mrs. Hayes)
760.46
0
760.46
Railway Express (automobile)
610.49
0
610.49
Ned Brown (agent)
250.00
0
250.00
Total
$8,579.97
$2,634.52
$5,945.45 Of the total traveling expenses ($8,579.97) incurred by John, he was reimbursed $6,969.97 by various employers. Respondent determined his total adjustment by subtracting $5,945.45 from $6,969.97 and adding thereto the alleged excessive travel expenses of $1,610. John was accompanied by his wife and three children when he was in California in 1961. They rented a house in Encino. The $603.12 which was paid to L. J. Miron was for the purchase of railroad tickets for John's family to travel to California *188 from Maine. In 1961 the petitioners claimed $766.58 for "Use of Residence as Office." This amount covered primarily the costs of office supplies and the maintenance of John's library. Respondent disallowed this entire deduction. Petitioners claimed a deduction of $895 in their 1961 income tax return for charitable contributions to the Assistance League and the Maine Coast Memorial Hospital. These contributions consisted primarily of articles of clothing for ladies and children, which the petitioners claimed as worth approximately $1,300 when new, and some draperies previously used by petitioners in their Encino home and valued by them at $200 in 1961. Respondent allowed this deduction to the extent of $296.70. Petitioners had a breeding herd of 46 Hereford cows which they purchased in 1958 at a cost of $125 per head or a total of $5,750. These cows had a useful life of 6 years and were depreciated on the straightline method. As of January 1, 1960, the herd had a depreciable basis of $3,386.21 or an adjusted basis of $73 per cow. Respondent disallowed depreciation deductions for the years 1960 and 1961 on the ground that the salvage value of the breeding herd exceeded the adjusted *189 cost basis on January 1, 1960. The herd was maintained by their agent on "native pasture" at Scottsbluff, Nebraska. Herefords from this area weigh approximately 650 to 800 pounds when culled (separated from the herd) and brought to market during the fall. However, there is shrinkage of approximately 5 percent of this gross weight during their transportation to the market. While subject to market fluctuations, such to the market. While subject to market fluctuations, such cows bring about $80 to $100 dollars a head if healthy. Miscellaneous transportation and market costs amount to about $15 per head. There is a mortality rate of 4 percent on the range. Although most range cattle from western Nebraska are classified as cutters and canners, some are condemned when brought to market and examined. If condemned, they may have no value or a negative value to the seller. Average net salvage value, i.e., the average market price of the culled cows less miscellaneous expenses, is $45 per head. In 1960 and 1961 the income tax returns of petitioners were prepared by a business management firm located in Beverly Hills, California. Their joint income tax return for the calendar year 1960 was *190 not filed with the district director of internal revenue at Los Angeles until August 3, 1961. On April 13, 1961, petitioners, through their business manager, requested an extension to July 15, 1961, for filing their 1960 return. The reason given for requesting an extension was that "additional time is required in order to secure the information necessary to prepare a proper return." On or before April 21, 1961, the district director refused to grant the request. On April 21, 1961, their business manager, in a letter bearing that date, requested reconsideration of the district director's decision. His explanation was that "Taxpayer resides in the northernmost part of Maine and has been traveling a great deal. Consequently, the information necessary to prepare such return has been unavailable. An extension of 90 days is therefore requested." On May 9, 1961, the district director denied the request for reconsideration and stated that the return should be filed as soon as possible. The joint income tax return of petitioners for 1960 was filed with the district director of internal revenue at Los Angeles on August 3, 1961. Attached thereto was the following statement of the reason for *191 the late filing: Taxpayer resides in the State of Maine. He traveled to Los Angeles in February to write a screenplay for THE CHILDREN'S HOUR which was interrupted by illness and hospitalization which forced his return to Maine on the 4th of July. Because of taxpayer's engagement in the motion picture commitment and the illness he was unable to prepare all the information necessary for a proper return until this time. In January 1961 the petitioners' daughter became ill with a serious case of staph pneumonia. Shortly thereafter, their oldest son came down with pneumonia and was confined in a hospital. In April, Mildred had a ruptured appendix which was removed. Then, in June, John, who had gone to California in February to work on a movie script, collapsed from complete physical and mental exhaustion. He was sent back to Winter Harbor on a train in July and was confined to a wheelchair. John kept his personal files at his family residence at Winter Harbor. Records needed by his business manager to complete the income tax return for 1960 were not available in California prior to July 1961. Petitioners made a timely request with the State of California for an extension of the due *192 date for filing their State income tax return for the year 1960. Such request was granted. Opinion 1. Business expenses. The petitioners claimed $4,289.52 in their 1960 income tax return as "Business Contacts and Promotion" expenses. Respondent disallowed this deduction to the extent of $1,885.42. The evidence shows that John maintained an office in his residence, entertained business associates in his home and at restaurants, and made miscellaneous cash expenditures of a business nature. However, since there is not adequate substantiation of the claimed expenses in 1960, we will apply the so-called Cohan rule (39 F. 2d at p. 544) and make an approximation. Using our best judgment, we conclude that the petitioners are entitled to deduct $3,346.81 instead of the $4,289.52 claimed by them. Similarly, while petitioners deducted $4,786.86 for "Business Contacts and Promotion" expenses in 1961, respondent disallowed $1,569.46 of this amount. Here again John incurred business expenses, but he has failed to substantiate them fully. Using our best judgment, we allow a deduction of $4,001.93. Petitioners deducted 75 percent of their total automobile expenses in 1960 and *193 1961 as having been incurred in connection with John's business activities. Respondent determined that 50 percent of such amounts were expended for business purposes. It is clear from the record that petitioners owned or rented two cars during the years in question. It is also clear that John used these automobiles for business purposes, viz., to obtain office supplies, to go to lectures, or to reach public transportation in conjunction with business trips. However, the petitioners have not proved to our satisfaction that any more than the 50 percent of their total automobile expenses related to John's business activities. Since Mildred and John used both cars for personal as well as business purposes, we think the respondent's determination is reasonable and we will not disturb it. Petitioners claimed $766.58 on their 1961 return as a deduction for "Use of Residence as Office." This was claimed in addition to depreciation, utilities, food, and various household expenses which petitioners deducted as "Business Contacts and Promotion" expenses. Applying the Cohan rule, we hold that petitioners are entitled to a deduction of $300 on this item. John received $5,806.13 in 1960 as travel *194 reimbursement from various employers. According to a general ledger account entitled "Travel Expense" which was kept by his agent, he incurred travel expenses of $5,277.58. The record is not clear as to whether the petitioners have already deducted these miscellaneous expenditures under other expense headings. They have provided us with little or no evidence with regard to this item. Consequently, we must treat the additional amount ($528.55) of reimbursement from John's employers as income in 1960. Respondent determined an adjustment of $2,634.52 in traveling expenses claimed by John for the year 1961. John now agrees that $603.12 of the amount previously claimed as traveling expense was for the purchase of railroad tickets for his wife and children, and thus a personal expense. In addition, when John was in California, he was accompanied by his wife and three children who shared the rented hom there. Neither Mildred nor the children performed any business services. Hence we believe respondent properly disallowed one quarter of the rent and utility expenses incurred in California as personal nondeductible expenditures under the provisions of section 1.162-2(c), Income Tax Regs. *195 [1]
Likewise, petitioners have presented no evidence with respect to the "miscellaneous travel expenses" respondent disallowed and they have not met their burden of proof in regard to them. As a result, we sustain respondent's determination in disallowing travel expenses of $2,634.52 for 1961. 2. Charitable contributions. Respondent allowed $296.70 of $895 claimed by petitioners as charitable contributions of used clothing and draperies to the Assistance League and the Maine Coast Memorial Hospital in 1961. Petitioners submitted in evidence lists which show the price of these articles when purchased *196 new. These lists totaled approximately $1,300 for the clothes, and $200 for the draperies, although John testified that the draperies cost $1,200 when new. Most of the clothes were at least two years old when petitioners contributed them and the draperies had been used by petitioners in their Encino home and were not usable in their Maine residence. On this record, and using our best judgment, we hold that the clothes and draperies had a fair market value of $500 at the time they were given away by petitioners. See Daniel S. McGuire, 44 T.C. 801 (1965). 3. Depreciation of breeding cattle herd. Petitioners bought a herd of 46 Hereford cows in 1958. They contend that, when culled, these cattle had a net salvage value of $45 (market price less transportation and other miscellaneous costs of preparing the cattle for market). Respondent, on the other hand, contends that these cattle had a net salvage value of approximately $100 each. The cows, coming from western Nebraska and ordinarily culled in the fall, most often fall into the classification of "cutters and canners" when brought to market. Based on an average weight of 650 to 800 pounds, they bring a price of roughly *197 $80 to $100 each if healthy. But other factors must be considered. The price of cattle is subject to violent cyclical and seasonal variations which on occasion have depressed the price far below these levels. A number of them are found to be diseased and are condemned when arriving at market, thus having little or no marketability. There is a mortality rate of roughly 4 percent on the range. And transportation and market expenses run between $15 and $20 per cow. Taking into account all of these variables and the risks inherent therein, we agree with the expert testimony of petitioners' witnesses that $45 is a reasonable net salvage value. Accordingly, we hold that petitioners are entitled to depreciate their breeding herd beyond its adjusted basis, as of January 1, 1960, of $73 per head. The amount of depreciation allowable and the adjustments to capital gains for those years which are caused by adjustments to the cost basis of the cattle can be computed under Rule 50. 4. Addition to tax for failure to file a timely tax return for 1960. The request of petitioners for an extension of time in which to file their 1960 income tax return was denied by respondent, who told them in a subsequent *198 letter to file a written statement explaining their delinquency when they filed their return. The petitioners filed their return on August 3, 1961, and attached a statement explaining the reasons for the late filing. The reasons were (1) a pressing motion picture commitment and (2) illness which required John's hospitalization and forced his return to Maine on July 4. Because of these, the petitioners stated that they were unable to prepare all the information necessary for a proper return until the date that the return was actually filed. To excuse late filing a taxpayer must show reasonable cause. [2] Prevention from a timely filing of one's return because of a heavy workload or business engagements is not generally considered a sufficient excuse to be "reasonable cause." Cowden v. Commissioner, 365 F. 2d 832 (C.A. 1, 1966), affirming per curiam a Memorandum Opinion of this Court. However, illness is "reasonable cause" if it can be shown that the taxpayer is prevented from filing a timely return because of such illness. Alma Williams, 16 T.C. 893, 906 (1951). *199 Here the petitioners had two children who were seriously ill with pneumonia in early 1961. Mildred had a ruptured appendix requiring an emergency operation in the first part of April and was incapacitated. Then, in June, John suffered a mental and physical collapse which necessitated his hospitalization and eventual return to Maine in a wheelchair. During these illnesses, while petitioners were staying in California and their income tax return was being prepared by a management concern there, all of the personal records necessary to complete the tax return were located in Maine. In view of these circumstances, we conclude that petitioners could not have obtained the necessary records and thus had "reasonable cause" for not filing their return until August 3, 1961. Therefore, we hold that respondent erred in determining an addition to tax under section 6651(a), Internal Revenue Code of 1954, for the year 1960. *200 Decision will be entered under Rule 50. Footnotes
1. Sec. 1.162-2 Traveling expenses. * * *
(c) Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. The same rules apply to any other members of the taxpayer's family who accompany him on such a trip.↩
2. Sec. 301.6651-1(a)(3), Proced. & Admin. Regs. (3) Showing of reasonable cause. A taxpayer who wishes to avoid the addition to the tax for failure to file a tax return must make an affirmative showing of all facts alleged as a reasonable cause for his failure to file such return on time in the form of a written statement containing a declaration that it is made under penalties of perjury.↩