*Decision will be entered under Rule 50.*

ELECTRIC & NEON, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LUIS AND ALICIA JIMENEZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 1058–66, 3259–70, 1059–66, 3220–70. Filed September 21, 1971.

*Towner Leeper*, for the petitioners.
*Harold Friedman*, for the respondent.

---

SIMPSON, *Judge:* In docket Nos. 1058–66 and 3259–70, the respondent determined the following deficiencies in the Federal income tax of the petitioner, Electric & Neon, Inc.:

| Year ended Sept. 30— | Deficiency | Year ended Sept. 30— | Deficiency |
|---|---|---|---|
| 1961 | $29,742.54 | 1964 | $20,511.09 |
| 1962 | 8,620.72 | 1965 | 13,427.87 |
| 1963 | 11,150.35 | 1966 | 11,343.53 |

The respondent also determined an overassessment in the Federal income tax of such petitioner for the year ended September 30, 1967, in the amount of $2,404.34. In his answer to such petitioner's amended petition, the respondent alleged that if there is to be an adjustment under section 481, I.R.C. 1054,[1] as was proposed in the amended petition, then the deficiency for the year ended September 30, 1961, would be increased to "at least $85,141.61" as a result of such adjustment.

In dockets Nos. 1059–66 and 3220–70, the respondent determined the following deficiencies in, and additions to, the Federal income tax of the petitioners, Luis and Alicia Jimenez:

| Year | Deficiency | Addition, sec. 6651(a) | Year | Deficiency | Addition, sec. 6651(a) |
|---|---|---|---|---|---|
| 1961 | $2,852.60 | $713.15 | 1965 | $1,171.00 | |
| 1962 | 2,381.95 | 357.29 | 1966 | 4,297.00 | |
| 1963 | 5,160.32 | | 1967 | 4,412.00 | |
| 1964 | 1,868.68 | | | | |

The primary issues for decision are: (1) Whether the petitioner, Electric & Neon, Inc., may treat as an expense the costs of constructing large electrical signs 'which it leased; (2) whether the petitioner Luis Jimenez realized additional dividend income or compensation as a result of certain funds and property which he withdrew from such corporation; and (3) whether Mr. and Mrs. Jimenez had reasonable cause for the late filing of their Federal income tax returns for 1961 and 1962.

FINDINGS OF FACT

The petitioners, Luis and Alicia Jimenez, resided in El Paso, Tex., when the petitions were filed in this case, and at all times relevant hereto. They filed their joint Federal income tax returns for the years 1961 through 1967 with the district director of internal revenue, Austin, Tex. Mr. Jimenez will sometimes be referred to as the petitioner.

The petitioner, Electric & Neon, Inc. (E & N), is a corporation which had its principal place of business at all times relevant to this case in El Paso, Tex. It filed its Federal income tax returns, using the

---

[1] All statutory references are to the Internal Revenue Code of 1954.

accrual method of accounting, for the years ended September 30, 1961 through 1967, with the district director of internal revenue, Austin, Tex. Hereafter, a fiscal year of E & N will be identified by the calendar year in which it ends.

During all the years in issue, the petitioner was the president of, and owned substantially all the stock of, E & N. He had been associated with its predecessor company since about 1940. The business was incorporated in 1947; the petitioner became a shareholder at that time and has owned substantially all the stock since 1956. He owned about 97 percent of such stock at the time of trial.

### Method of Accounting

E & N is, and has been during the taxable years here in issue, in the business of manufacturing, installing, and leasing or selling, electric, neon, and plastic signs and displays. The signs, most of which are large, are custom-made to suit the particular needs of the customers and their business premises. Most of such signs are affixed to the property of the customers, either attached to the face of the building or placed on a pole or beam.

Customers could either buy or lease the signs. Many of them preferred to lease; E & N and its predecessor company have been leasing out signs since 1940. When E & N enters into a leasing arrangement, and the lessee defaults in making the payments called for by the lease, E & N removes the sign; but because of its custom-made nature, the sign is rarely usable for any other customer, and thus has virtually no value to E & N. Similarly, when a lease on a sign expires, if the customer does not renew the lease, it is general practice in the sign industry to take the sign down and junk it. The cost of labor usually makes it impractical and uneconomical to alter an existing sign to suit the needs of another customer.

The leased signs which produced income during the years here in issue were constructed between October 1, 1955, and September 30, 1967. The original terms of the leases entered into by E & N with respect to the signs constructed for lease during that period varied in length from 1 to 10 years; the most usual length of such original leases was 5 years. A number of signs constructed before October 1, 1960, were still producing income in the years in issue, some still under the original leases.

E & N treated the entire cost of constructing such signs, including materials, supplies, labor, freight, supervisory salary, workmen's compensation insurance, payroll taxes, licenses, and miscellaneous job costs, as a current expense for Federal income tax purposes, as well as for the corporation's own accounting purposes. When such signs were

leased, the lease income was reported on a monthly basis over the life of the lease. The charges billed in a particular month were accrued in that month on the books of the corporation. E & N's procedure with respect to treating the cost of the leased neon signs as expenses had been followed consistently by that corporation and its predecessor company since 1940 when the latter first started leasing signs.

During the years in issue, E & N received income from repair work that it performed, in addition to the lease revenue. The corporation's expenses for materials and supplies included those consumed with respect to its non-lease-related repair work, as well as those used incident to its responsibilities with respect to the leases.

Over the term of the original lease of a sign, without renewal, E & N generally received in rental payments a total sum which was very substantially in excess of the cost of constructing the sign. Many of the leases on E & N's signs were renewed. However, most of such renewals were at reduced rental rates. Furthermore, even taking the renewals into consideration, very few of the leased signs could be expected to produce income over a 12-year period.

It has been the longstanding and general practice in the electric and neon sign industry to treat the costs of constructing such a sign as capital expenditures to be depreciated over the period of the original lease of the sign. It is a general practice, when a lease is renewed, to charge a substantially reduced rental—merely enough to cover the costs of maintaining the sign and carrying the insurance on it.

The respondent had previously audited E & N with respect to fiscal 1956, 1957, and 1959, but the respondent did not on such occasion require any change in E & N's method of accounting generally, or in its method of treating the cost of the signs as expenses, specifically. In fact, the revenue agent's report dated June 26, 1961, resulting from such audit made no mention of the leasing aspect of E & N's business or the accounting practices used in connection therewith. However, the makeup of E & N's business in the pre-1961 years was not the same as that in the later years; such corporation engaged in a different category of business, electrical contracting, during at least the 5 years prior to September 30, 1960, but not thereafter.

According to the method of reporting income used by E & N during the years in issue, its aggregate taxable income was $97,970.61. However, according to the method of accounting used by the respondent in his redetermination of E & N's income, the aggregate taxable income for such years was $368,546.11.

For the years in issue, the respondent disallowed the deductions claimed by E & N with respect to the cost of constructing the signs which it leased; he took the position that such costs were capital

expenditures, depreciable over a 12-year period. He allowed deductions for depreciation on such alleged capital assets.

In its amended petition, E & N alleged for the first time that the respondent should have allowed depreciation on the signs constructed prior to the beginning of the first taxable year here in issue, but which were still producing income during the period with which we are here concerned. E & N there alleged that if the cost of the leased signs must be capitalized subject to depreciation, then a computation should be made pursuant to section 481 to allow depreciation deductions with respect to such previously constructed signs. In his answer to that amended petition, the respondent agreed that section 481 might be applicable, but alleged that if an adjustment was required pursuant thereto, then an additional deficiency would result with respect to fiscal 1961. He specifically alleged the amount of such increased deficiency for that fiscal year, as we set forth earlier. He indicated that it would be necessary to add to E & N's income for that year the amount of the "adjusted basis" of the previously constructed signs, the costs of which had been deducted by E & N in the years of construction, in order to permit E & N to take depreciation deductions with respect to such signs in the years in issue.

E & N also alleged in its amended petition that if it is required to capitalize sign costs, then it "is entitled to double declining balance depreciation, additional first year depreciation, and investment credit."

### Withdrawals from Corporation

The petitioner withdrew funds from E & N by means of an account receivable, designated as "Account 109," which E & N maintained on its books for the petitioner. The outstanding balance of such account was $2,011.75 on January 1, 1961; $88,126.40 on December 31, 1967; $96,733.70 on September 30, 1968; and approximately $109,000 at the time of trial. The net increases in Account 109 for each calendar year and each fiscal year of E & N were as follows:

| Year | Calendar year | Fiscal year | Year | Calendar year | Fiscal year |
|------|------|------|------|------|------|
| 1961 | $9, 923. 21 | $9, 054. 03 | 1965 | $4, 642. 48 | $6, 597. 38 |
| 1962 | 10, 996. 73 | 12, 291. 35 | 1966 | 17, 132. 66 | 12, 232. 29 |
| 1963 | 19, 136. 77 | 21, 696. 54 | 1967 | 15, 677. 00 | 14, 567. 70 |
| 1964 | 8, 605. 80 | 4, 618. 86 | | | |

The funds which E & N disbursed to the petitioner via Account 109 were for his own personal use and benefit and that of his family.

Relative to the numbers and amounts of the withdrawals, the "repayments" to Account 109 were few in number and insignificant in amount, with the result that the outstanding balance of the account rose steadily. Even so, many of what "repayments" were made were not

actually cash payments by the petitioner to E & N, but rather, represented credits for rental of premises owned by the petitioner and occupied by E & N. Mr. Jimenez described such payments as being just paper entries.

When the petitioner used corporate checks to pay for personal expenses, he simply instructed the bookkeeper to write out such a check and charge it to him personally on Account 109; no one else's approval was necessary. No ceiling was set with respect to such withdrawals; the amounts disbursed depended solely on the petitioner's judgment. The withdrawals were used for the petitioner's ordinary day-to-day family living expenses, not for unusual nonrecurring items. In order for the petitioner to repay the amount of the outstanding balance of Account 109, he would have to sell or otherwise liquidate substantially all of his assets.

The petitioner did not execute a note reflecting an obligation to repay E & N for the cash that it disbursed to him and on his behalf, nor was any other sort of security given. There was no fixed maturity date by which the petitioner was required to repay such disbursements, and there is nothing in the corporate records of E & N to reflect a repayment obligation on the part of the petitioner. However, on each of the financial statements prepared with respect to E & N by its accountants during the years in issue, the current aggregate amount of the petitioner's cash withdrawals (the balance of Account 109) was shown as an asset, denoted as accounts receivable. Such financial statements were furnished by E & N to its creditors and to the bank with which it dealt.

E & N did not declare or pay any formal dividends in the years ending September 30, 1961 through 1967, inclusive.

During E & N's fiscal years 1961, 1962, 1963, and 1964, the petitioner removed various materials and supplies from E & N for his personal use. The cost of the materials and supplies so removed during each of those years was $3,220.95, $100.01, $121.70, and $112.60, respectively. Those amounts were treated as "materials and supplies" expenses in the records and tax returns of E & N for those years.

During the years in issue, the petitioner performed substantial services for E & N. E & N was essentially a one-man operation; the petitioner had full responsibility for the running of the business, and he worked regularly in excess of 60 hours per week to discharge such responsibility.

An officer of another manufacturer of electric and neon signs, who was familiar with the operations of E & N, was of the opinion that Mr. Jiminez, with the assistance of a shop superintendent, performed services similar to those performed by the president, the vice president,

a salesman, and a supervisor of that corporation. In 1967, that manufacturer offered the petitioner employment as a salesman. The guaranteed income from such employment would have been $15,000 per year, but the petitioner estimated that his sales commissions could have brought the annual income up to $25,000. However, the petitioner rejected the offer. Knowledge of, and experience in, the sign industry is a specialty in itself, within the electrical field.

The petitioner received the following amounts as his stated salary from E & N in the following calendar years: $9,000 in 1961, $9,150 in 1962, $9,000 in 1963, $9,000 in 1964, $12,050 in 1965, $12,000 in 1966, and $12,100 in 1967. Such amounts were reported as salary income in the Jimenezes' joint income tax returns for those years. E & N deducted the following amounts as the petitioner's salary in the following fiscal years: $9,000 in 1961, $9,000 in 1962, $11,000 in 1963, $11,000 in 1964, $11,300 in 1965, $12,000 in 1966, and $12,000 in 1967. According to the corporate returns for all of such years, the petitioner was the only compensated officer.

On its Federal corporate income tax returns, E & N reported gross receipts as follows: $339,495.65 for 1961, $333,495.48 for 1962, $297,551.40 for 1963, $320,918.26 for 1964, $319,241.07 for 1965, $386,474.56 for 1966, and $380,952.62 for 1967.

According to E & N's books and records, under the accounting practices that it employed, its earnings and profits at the end of the following fiscal years were: 1958, $17,067.11; 1959, $12,867.56; 1960, $12,853.81; 1961, $13,060.23; 1962, $16,145.60; 1963, $13,040.13; 1964, $10,581.10; 1965, $30,880.81; 1966, $55,003.90; and 1967, $83,374.89. The petitioner was continuously aware of the amount of the corporation's earnings and profits, as reflected on its books.

The respondent determined that Mr. Jiminez received dividend income from E & N during the years 1961 through 1967 by reason of his withdrawals from Account 109 and his withdrawals of materials and supplies from the corporation. The respondent disallowed E & N's claimed deductions for materials and supplies expenses to the extent that such materials and supplies were allegedly used for the petitioner's personal benefit.

### Late Filing of Returns

The petitioner and his wife were having marital difficulties during 1961, 1962, and part of 1963. Mrs. Jimenez twice filed actions for divorce against the petitioner in the District Court of El Paso County, Tex., although each action was later dismissed.

Mrs. Jimenez handled the accounts for, and kept the records of the income and expenses with respect to, two rental properties which she

and the petitioner owned [2] during 1961 and 1962. The rental properties consisted of a house and an apartment building, both in El Paso. The Jimenezes acquired the house in 1954; prior to being converted to a rental property, it had been their personal residence. They acquired their ownership interest in the apartment building in 1960, and some of the rental income therefrom was used for the support of the petitioner's mother, who was his dependent during 1961 and 1962. The petitioner and his wife reported net income from their rental properties in the amounts of $605.21 in 1961 and $438.25 in 1962.

Customarily, the income tax returns of the petitioner and his wife were prepared by the accounting firm with which they dealt; such firm would then mail the prepared return to them, and they (the Jimenezes) would send such return to the Internal Revenue Service.

The Jimenezes' joint Federal income tax return for 1961 was signed and dated by the accounting firm which prepared it on April 27, 1962. It was filed with the respondent on December 17, 1962. When filed, it bore the signature of the accounting firm as the preparer, but did not bear the signature of either Mr. or Mrs. Jimenez.

On April 15, 1963, the petitioner filed an application for an extension of the filing date for his and his wife's joint Federal income tax return for 1962. Such application asked for a postponement of the due date to June 15, 1963, for the reason that "Certain information in regard to rental income is not available at this time." However, the respondent declined to consider the application for the reason that his office received the application after the due date of the return. The form on which the denial of the application was indicated contained the instruction, "Your return should be filed without further delay." Such form was dated May 3, 1963. The Jimenezes' Federal income tax return for 1962 was filed on June 20, 1963.

OPINION

*Issue 1. Method of Accounting*

The primary issue for decision is how E & N should have treated its costs of constructing signs with respect to which it was the lessor in the years ending September 30, 1961 through 1967. We must determine whether E & N's practice of treating such costs as current expenses was an acceptable method of accounting which clearly reflected income; if it was not, then we must consider what is an acceptable and proper method and what adjustments are required as a result of the change of method.

Section 446(a) permits a taxpayer to compute taxable income

---

[2] Mr. and Mrs. Jimenez owned a 60-percent interest in the apartment building.

"under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, section 446(b) provides in effect that if the taxpayer's method does not clearly reflect income, the respondent may redetermine and recompute the taxable income under a method which, in his opinion, does clearly reflect income. According to paragraph (a)(1) of section 1.446–1, Income Tax Regs., "method of accounting" includes not only the over-all method of accounting, but also the accounting treatment of any item. Paragraph (a)(2) of the same section provides that no method of accounting is acceptable unless, in the respondent's opinion, it clearly reflects income. Such paragraph also states that:

A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

Paragraph (a)(4) stresses that the taxpayer's accounting records must be such as to enable him to file a correct return of his taxable income for each taxable year. Among the essential features that a taxpayer must consider in maintaining such records is:

(ii) Expenditures made during the year shall be properly classified as between capital and expense. For example, expenditures for such items as plant and equipment, which have a useful life extending substantially beyond the taxable year, shall be charged to a capital account and not to an expense account.

One of the fundamental principles of our income tax system is the annual accounting concept; each year is a separate taxable unit. *W. A. Shaw*, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958); 2 Mertens, Law of Federal Income Taxation, sec. 12.06 (1967). Such principle, in combination with the foregoing statutory and regulatory provisions, requires us to evaluate E & N's accounting practices with a view toward whether such practices clearly reflected income on a year-by-year basis. To compute income properly on a year-by-year basis, capital expenditures are not currently deductible, but must be capitalized. Sec. 263. The taxpayer has the burden of proving that the amounts in issue are currently deductible expenses, rather than capital expenditures. *Henry M. Rodney*, 53 T.C. 287, 319–320 (1969); *Challenge Manufacturing Co.*, 37 T.C. 650, 662 (1962).

One common type of capital expenditure is "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year." Sec. 1.263(a)–2(a), Income Tax Regs. It is beyond dispute, and in fact, E & N does not dispute, that the signs which it constructed for lease did, with possibly very few

exceptions, have useful lives substantially beyond the taxable year of construction. We have found that the original leases for some of the signs lasted as long as 10 years and that the most usual term for the original lease of a sign was 5 years. Thus, it requires no further analysis or discussion to conclude that E & N erred in treating the costs of constructing such signs as currently deductible business expenses. In fact, E & N, on brief, admits as a general proposition, "Since the signs had a value extending beyond the year of construction, there is no question but what the cost of the signs should have been capitalized." We agree.

Despite the clear error in E & N's treatment of the costs of signs, it asks us to approve its accounting practices nevertheless, for the reasons that they allegedly clearly reflected income over a period of years, and that such practices had been consistently used over a long period of time. It urges us not to be bound by "inflexible accounting rules," and stresses the respondent's prior audit of the corporation in which no change of the accounting method was prescribed.

In answer to such argument, we point out first that the error in the petitioner's accounting method was not simply one of concept, but rather, was one which demonstrably produced serious inaccuracies in the year-by-year computation of income. As a result of its use of an improper method, E & N's taxable income would be seriously understated in a year when many new signs were constructed for lease, and just as seriously overstated in a year when very few signs were constructed, with the result of making the corporation's financial fortunes appear to be sinking when in fact it was enjoying great success, and rising when in fact its business was seriously diminished. E & N's accountant recognized that such a result was anomalous and that the use of such practice did not properly reflect income on a year-by-year basis. "Income must be reflected with as much accuracy as recognized methods of accounting permit." *Fort Howard Paper Co.*, 49 T.C. 275, 284 (1967) ; see also *Caldwell* v. *Commissioner*, 202 F. 2d 112, 115 (C.A. 2, 1953), affirming on this issue a Memorandum Opinion of this Court. That E & N's accounting method with respect to the treatment of the cost of the leased signs fell short of this requirement is obvious.

In response to the petitioner's argument, we point out next that while consistency is highly desirable when combined with some acceptable method of accounting, it is not a substitute for correctness; the respondent is justified in requiring a change in a taxpayer's method of accounting which, although consistently used over a period of years, is erroneous, and does not clearly reflect income. *Caldwell* v. *Commissioner, supra; All-Steel Equipment Inc.*, 54 T.C. 1749, 1756 (1970), on appeal (C.A. 7, 1971) ; *Fort Howard Paper Co., supra* at 284; *Photo-*

*Sonics, Inc.*, 42 T.C. 926, 935 (1964), affd. 357 F. 2d 656 (C.A. 9, 1966) ; *Ezo Products Co.*, 37 T.C. 385, 391 (1961) ; *D. Loveman & Son Export Corporation*, 34 T.C. 776, 797 (1960), affd. 296, F. 2d 732 (C.A. 6, 1961), certiorari denied 369 U.S. 860 (1962). The petitioner's method of costing the expenses of constructing leased signs was contrary to the longstanding and general practice in the electric and neon sign industry, and contrary to the method which, according to the Accounting Principles Board of the American Institute of Certified Public Accountants, was generally used by lessors for the treatment of the costs of leased property. Thus, consistent use of a method that is so clearly erroneous does not make it acceptable.

Finally, we point out that the report resulting from the respondent's prior audit of E & N makes no mention of such corporation's accounting practices with respect to the cost of the leased signs; it appears that the audit was focused on matters unrelated to that here in dispute. Other than the failure to make a specific objection, the respondent's agent who conducted the audit took no action and made no statement, as far as we know, which can even colorably be interpreted as placing his imprimatur of approval on these accounting practices. Moreover, it is settled law that the respondent's failure to object to a taxpayer's accounting method, despite opportunities to do so, does not prevent him from later challenging that method. *Niles Bement Pond Co.* v. *United States*, 281 U.S. 357, 362 (1930) ; *Wood* v. *Commissioner*, 245 F. 2d 888, 892 (C.A. 5, 1957), affirming on this issue a Memorandum Opinion of this Court; *Fort Howard Paper Co., supra* at 284; *Photo-Sonics, Inc, supra* at 935; *Ezo Products Co., supra* at 391.

Having concluded that the costs of the leased signs should have been treated by E & N as capital expenditures subject to recovery by means of depreciation deductions, the next question is, over what length of time should the depreciation be spread? The respondent has determined a 12-year period with respect to all of the signs; E & N contends that, if the costs of the signs should be capitalized, the depreciation should be spread over the life of the original lease with respect to each sign.

The cost of a capital asset, less its estimated salvage resale value, should be recovered by depreciation over its useful life. "Useful life" for this purpose is not necessarily the useful life physically inherent in the asset, but is the period for which the asset may reasonably be expected to be employed in the taxpayer's business, or in the production of his income. *Massey Motors* v. *United States*, 364 U.S. 92, 107 (1960) ; sec. 1.167(a)–1(b), Income Tax Regs.

E & N has shown that it is customary in the electric and neon sign industry to depreciate leased signs over the period of the

original lease. It has shown that more than a few of its leasing customers do not renew their leases on the signs, and that of the leases that are renewed, most are at reduced rates. It has shown also that, even taking the lease renewals into consideration, very few of the signs can be expected to produce income for a period of 12 years; the most usual length of an original lease was 5 years. It consistently recovered a sum substantially in excess of the cost of constructing the sign over the duration of the original lease. We hold that E & N has clearly carried its burden of proving error in the respondent's determination of 12-year useful lives for the leased signs, and we hold further that E & N has shown that the most accurate, fair, and realistic period to be considered as the useful life of each leased sign for depreciation purposes is the length of the original lease of such sign.

The purpose of the "matching" concept in accounting theory is to match the income earned by the taxpayer in a certain period with the costs attributable to producing such income in that period. It seems clear to us that when E & N constructs a sign and enters into a lease contract with respect to such sign, E & N is well aware that it can in no sense rely on such lease being renewed in later years, and therefore, it must recover the cost of such signs, plus other costs related to the maintenance and installation of the sign, plus the desired amount of profit, over the term of the original lease. Thus, for tax purposes, we think it is reasonable to let such corporation "recover" the cost of each sign through depreciation over that same period. When a lessee renews its lease at a reduced rate, it seems that such renewal is considered to be in the nature of a profitable maintenance contract from E & N's standpoint. When a lessee renews its lease at the original rate—a rare occurrence, this is in the nature of a windfall for E & N, because the sign has already been paid for and then some. Whether a lease will be renewed at all for what length of time, and at what monthly rate, are all questions about which E & N can only speculate and conjecture at the time of entering into the original lease. Furthermore, unlike a building, an automobile, or an item of industrial equipment in common usage, the signs in issue here are generally rendered worthless when the original lessees are finished with them. Whether a lease is renewed is much more crucial in the present case than it is when the asset in question has a substantial potential value to another user.

The revenue agent who worked on the examination of E & N decided on a 12-year life for the signs on the basis of a Government "depreciation guideline" which specified a 12-year life for electrical equipment. Such agent testified at trial that whether a 12-year life

is a proper application of the "matching" concept in this case "would depend on the probability of the lease being renewed"; however, the agent "didn't explore that area" with respect to E & N's leases. The "guideline" used by the agent may have been Rev. Proc. 62–21, 1962–2 C.B. 423. While Rev. Proc. 62–21 may accurately set forth the average useful life of electrical equipment as 12 years, E & N has successfully established that such guideline is inapplicable in its business and that, in its business, the useful life of a sign varies with the length of the original lease thereof. We think that the depreciation period which we have found here is the one which best conforms to the rule prescribed by the Supreme Court in *Massey Motors* v. *United States, supra,* and to the rule prescribed by the respondent in section 1.167(a)–1(b), Income Tax Regs.

Another dispute between E & N and the respondent concerns depreciation deductions in the years in issue with respect to the signs constructed prior to October 1, 1960, but which continued to produce income after that date. We have set forth the manner in which this issue was developed in the parties' pleadings; the respondent agreed to E & N's request that it be allowed depreciation with respect to such signs, with the proviso that the "adjusted basis" of such signs be included in the corporation's income in fiscal 1961 to prevent the duplication that would occur if E & N was to take depreciation deductions on assets the costs of which it had already deducted as current expenses. In his answer to E & N's amended petition, in which E & N had raised the subject for the first time, the respondent specifically alleged the amount of the increased deficiency for fiscal 1961 which would result from such treatment. These facts were set forth to demonstrate that there is no merit in E & N's contention that the respondent was claiming an additional deficiency in his brief for the first time.

We turn now to the substantive questions regarding the adjustment under section 481. Such section provides that when a taxpayer's income for a taxable year is computed under a method of accounting different from that used in the preceding year, the first year in which the new method is used shall be known as the "year of the change," and in such year "there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted." A change in the treatment of a recurring material item is considered as a change in the method of accounting, to which section 481 applies. *Shepherd Construction Co.,* 51 T.C. 890, 898 (1969) ; *Fruehauf Trailer Co.,* 42 T.C. 83, 104 (1964), affd. 356 F. 2d 975 (C.A. 6, 1966), certiorari denied 385 U.S. 822 (1966) ; sec. 1.481–1(a)(1), Income Tax Regs. Indeed, the

parties to the case at hand agree that section 481 is applicable in the event that we find (as we did) that signs constructed prior to October 1, 1960, produced substantial amounts of lease income during the years in issue, and in the event that we conclude (as we did) that the cost of the leased signs must be treated as capital expenditures. The year of change, the first year in which the new method of accounting is to be used, is of course fiscal 1961.

The parties apparently agree that E & N is entitled to deductions in the years in issue by reason of the depreciation of the previously constructed but still productive signs, the useful lives of which extend into the period here under consideration. Both parties' tentative computations were made on the basis of a 12-year useful life for each sign, but as we have held that the useful life of each sign for depreciation purposes is the length of its original lease, we cannot adopt either of the tentative computations. No doubt, the parties can agree upon a recomputation giving effect to our holding with respect to the useful life of each sign, but it remains for us to pass upon the respondent's proposed adjustment in which he would include in E & N's 1961 fiscal year the adjusted bases of the signs the useful lives of which extend into the years in issue. The "adjused basis" as proposed by the respondent consists of E & N's original cost basis in the sign minus the depreciation that would have been allowable prior to October 1, 1960.

It seems to us that the adjustment proposed by the respondent is authorized by section 481. Such section seeks, in its own words, "to prevent amounts from being duplicated." The Senate Finance Committee, in discussing the proposed effects of such section, indicated that "no item is to affect the computation of taxable income more than once." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 308 (1954). See also *Fred P. Pursell*, 38 T.C. 263, 270–271 (1962), affirmed per curiam 315 F. 2d 629 (C.A. 3, 1963). Section 481 was "designed to prevent * * * a windfall to the taxpayer stemming from a change in accounting at a time when the statute of limitations bars reopening the taxpayer's returns for earlier years." *Graff Chevrolet Co.* v. *Campbell*, 343 F. 2d 568, 572 (C.A. 5, 1965).

With respect to the signs in issue in the adjustment, E & N seeks to take depreciation deductions with respect to items the cost of which it previously deducted as business expenses. If no offsetting adjustment such as that proposed by the respondent is made, the treatment advocated by E & N would result in a clear duplication of deductions; the same items would twice affect the computation of E & N's taxable income, and such corporation would receive a windfall by reason of the fact that the statute of limitations now prevents the respondent from disallowing the erroneous deductions taken prior to fiscal 1961.

The respondent's proposed adjustment is a reasonable manner of carrying out the purpose of section 481; it avoids allowing deductions twice for the same costs of the signs which were depreciable in the years in issue. This same method was applied by the respondent in Rev. Rul. 67-379, 1967-2 C.B. 127, which dealt with a change in the method of treating the costs of baseball-player contracts. Although he applied a different method of adjustment in Rev. Rul. 70-318, 1970-1 C.B. 113, which involved the same issue, E & N has not asked us to adopt the method used in that revenue ruling; it merely objected to any adjustment under section 481 requiring it to include the adjusted bases of the signs in the years in issue. Accordingly, we hold that the adjustment of the type proposed by the respondent, subject to the difference in the lengths of the signs' useful lives as we have determined, should be effected for the fiscal year 1961, subject to the provisions of limitation set forth in section 481(b). See *Dearborn Gage Co.*, 48 T.C. 190, 198 (1967).

The last question to which we must address ourselves with respect to E & N's accounting practices involves that corporation's contentions that, if the signs are capital assets, then it is entitled to an additional first-year depreciation deduction pursuant to section 179, to the use of the double-declining-balance method of depreciation, and to an investment credit pursuant to section 38, with respect to new signs it constructed during the years in issue. E & N asserts that its requested adjustments "are mathematical in nature and may be given effect in a Rule 50 computation." The respondent agrees that such adjustments may be disposed of in the Rule 50 computation, on the basis of this Court's holding as to the other parts of this issue, with the exception of the request for additional first-year depreciation allowance under section 179. As to that allowance, the respondent points out that "there is a problem of timeliness of election." There may be several questions as to whether E & N qualifies for the various requested adjustments, but to the extent that it does qualify, they should be allowed in the Rule 50 computation.

### Issue 2. *Withdrawals From Corporation*

The issue for decision is the proper tax treatment, by both the petitioner and E & N, of the petitioner's withdrawals of cash and materials and supplies from the corporation during the years in issue.

We shall deal first with the question of whether the petitioner's cash withdrawals from E & N should be treated as loans, in accordance with his principal contention. Such question must be decided on the basis of the facts and circumstances surrounding the transaction; the decisive criterion is whether the parties to the alleged loan really

intended to create a bona fide indebtedness each time the money was disbursed. *Berthold* v. *Commissioner*, 404 F. 2d 119, 122 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court; *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957); *Jack Haber*, 52 T.C. 255, 266 (1969), affirmed per curiam 422 F. 2d 198 (C.A. 5, 1970); *Elliott J. Roschuni*, 29 T.C. 1193, 1201–1202 (1958), affd. 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960). When the individual who withdraws the funds from the corporation is in control of it, such situation invites special scrutiny. *Jack Haber, supra; Elliott J. Roschuni, supra* at 1202; *William C. Baird*, 25 T.C. 387, 393 (1955); *W. T. Wilson*, 10 T.C. 251, 256 (1948). We must evaluate whether there was a reasonable expectation of repayment under the particular circumstances of the case, taking into consideration the economic realities. *Irving D. Fisher*, 54 T.C. 905, 910 (1970); *Wilfred J. Funk*, 35 T.C. 42 (1960); *Caroline D. Thompson*, 22 T.C. 507 (1954). Furthermore, it is relevant to inquire whether the alleged lender had a good-faith intent to enforce the repayment of the disbursed funds. *Anson Beaver*, 55 T.C. 85, 91 (1970); *Irving D. Fisher, supra; Jack Haber, supra.*

In the present case, we believe that only the formal appearance of the account receivable supports the petitioner's contention that loans were intended. Outside of such form, there was no expression of any obligation on the part of Mr. Jimenez to replenish the corporate treasury, nor do we think that he believed himself to be so bound. From January 1, 1961, until the time of trial, a period of slightly over 9 years, the outstanding balance of the account had risen from about $2,000 to about $109,000, increasing in each successive year; "repayments" were few in number and relatively meager in amount. There is utterly no indication that any more meaningful repayment was contemplated for the future; there is no reason to think that the account balance would have gone in any direction but steadily up. For Mr. Jimenez to make complete restitution, he would be required to liquidate substantially all of his personal assets. The likelihood of E & N making such a demand of its 97-percent shareholder under the circumstances as they appear here is, we think, so close to nil that it does not merit serious consideration. The facts of this case indicate that the petitioner had unfettered dominion and control over the corporate affairs. Except for the form, all of the relevant facts are antithetical to the conclusion that the parties intended that Mr. Jimenz be obligated to pay back the money. The petitioner argues that he sometimes pledged assets which he owned personally as security for commercial loans the proceeds of which were used for E & N's purposes,

but this does not convince us that he was obligated to pay back the funds he withdrew from such corporation. We conclude that the petitioner's cash withdrawals from E & N by means of Account 109 were not intended to be loans.

It is now necessary to determine whether those amounts were disbursed by E & N as distributions of corporate profits or as compensation for services performed. A similar determination must be made with respect to the petitioner's withdrawals of materials and supplies for personal use; such withdrawals were not alleged to be loans. No separate argument was made with respect to the withdrawals of materials and supplies; thus, we will consider them together with the cash withdrawals, as the applicable legal criteria are the same.

The distinction between distributions of profit and compensation for services is of primary significance to E & N; of course, the corporation cannot deduct any of the amounts it disburses as dividends, but it may deduct the amount of compensation that it pays, so long as such payments (1) do not exceed the reasonable compensation for the services actually rendered, and (2) are actually intended to be paid purely for the services. Sec. 1.162–7, Income Tax Regs. Since the respondent has determined that the withdrawals of cash and materials and supplies by Mr. Jimenez were dividends, E & N and Mr. Jimenez have the burden of showing such determination to be incorrect. *W. T. Wilson, supra* at 256.

The test of the deductibility of alleged compensation is, as we mentioned, two-pronged. However, in this case, the respondent does not contend that the amounts which Mr. Jimenez received from E & N, including the withdrawals and his stated salary, constituted unreasonable compensation for his services. Rather, the respondent's position is that the amounts which Mr. Jimenez received from E & N in excess of his stated salary were not *intended* to be paid as compensation. It is settled law that such intent must be shown as a condition precedent to the allowability of a deduction to the corporation. *Charles McCandless Tile Service* v. *United States*, 422 F. 2d 1336, 1339 (Ct. Cl. 1970); *Northlich, Stolley, Inc.* v. *United States*, 368 F. 2d 272, 278 (Ct. Cl. 1966); *Irby Construction Co.* v. *United States*, 290 F. 2d 824, 826 (Ct. Cl. 1961); *Klamath Medical Service Bureau*, 29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (C.A. 9, 1958), certiorari denied 359 U.S. 966 (1959); *Twin City Tile & Marble Co.*, 6 B.T.A. 1238, 1247 (1927), affd. 32 F. 2d 229 (C.A. 8, 1929).

Whether such intent has been shown is, of course, a factual question to be decided on the basis of the particular facts and circumstances of the case. On the basis of the evidence presented, we must conclude that neither the petitioner nor E & N has made such a showing. He

did not testify that the withdrawals in excess of stated salary were intended to compensate him additionally for his services; rather, his only testimony with respect to intent was in support of the loan argument, which we have rejected. His testimony that the withdrawals were intended to be loans does, in fact, tend to negate his alternative argument that compensation was intended. If he really believed the withdrawals to be compensation, then he should have reported it as such on his income tax returns, but he did not. Likewise, E & N, which presumably would have believed itself entitled to a deduction for such amounts if it had intended them as compensation, claimed no deduction for those sums on its own income tax returns, and did not report such amounts as compensation paid on Mr. Jimenez's W-2 forms.

The record in this case, and especially the testimony of Mr. Jimenez, is permeated throughout with indications of a shareholder-employee acting in disregard of the distinction between the corporation's funds and his own. When he wanted money for his personal needs, Mr. Jimenez instructed E & N's bookkeeper to that effect, and she issued a corporate check in the desired amount, and "charged" the disbursement to Account 109. The amounts of such disbursements were within the unfettered control of Mr. Jimenez, and it is clear that the amounts were geared more to the extent of his personal needs than to the value of the services performed. There is no evidence to indicate that his services were worth more in any one year than another; yet, the amounts of the withdrawals fluctuated sharply. Such fluctuations, unrelated to the quantum of services performed, do further damage to the petitioner's contention that the payments were purely for compensation.

In support of the argument for compensation, Mr. Jimenez testified that, during the early years of his ownership of the business, he deliberately set his salary low in order to pay off more quickly the indebtedness which he had incurred for its purchase. During the years in issue, Mr. Jimenez rendered valuable services to E & N, and the reasonable compensation for his services was substantially greater than his stated salary. Nevertheless, such evidence shows merely that Mr. Jimenez could have been paid significantly more compensation; it fails to establish that the withdrawals were intended as additional compensation, and the evidence previously reviewed by us shows that in fact they never put into effect any contemplated increase in his compensation. Even if Mr. Jimenez was currently aware of the earnings and profits of the corporation, as he contended, such fact does not convince us that the withdrawals were intended as compensation.

We anticipate that, as a result of computations pursuant to our

holding in issue 1, E & N's earnings and profits will be shown to have actually been substantially greater than the amounts indicated on its records. To the extent of such earnings and profits, as correctly determined, we hold that Mr. Jimenez's withdrawals of cash and materials and supplies from E & N, in excess of stated salary, constituted dividend distributions. Regardless of earnings and profits, the amounts of such excess withdrawals may not be deducted by E & N, as it has not shown that those amounts were paid out as an ordinary and necessary business expense.

### *Issue 3. Late Filing of Returns*

The issue for decision is whether the individual petitioners have shown that their failure to timely file their Federal income tax returns for 1961 and 1962 was "due to reasonable cause and not due to willful neglect," within the meaning of section 6651(a). The burden of proof rests upon them. *C. Fink Fischer*, 50 T.C. 164, 177 (1968); *Rudolf A. Zivnuska*, 33 T.C. 226, 239 (1959); Rule 32, Tax Court Rules of Practice.

Mr. and Mrs. Jimenez reported their income on the basis of the calendar year; therefore, their returns for 1961 and 1962 were due to be filed on April 15, 1962, and April 15, 1963, respectively. Sec. 6072(a); sec. 1.6072–1(a), Income Tax Regs. However, section 301.6651–1(a)(3), Proced. & Admin. Regs., provides: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Thus, if the untimeliness of the Jimenezes' returns was due to a reasonable cause, they are not liable for the penalties determined by the respondent; but if the taxpayers fail to show a reasonable cause for the late filing, the penalty must be upheld, even if there is no willful neglect. *Coshocton Securities Co.*, 26 T.C. 935, 939–940 (1956); *George S. Van Schaick, Supt. of Insurance*, 32 B.T.A. 736, 744 (1935); *Charles E. Pearsall & Son*, 29 B.T.A. 747, 749 (1934); *Rogers Hornsby*, 26 B.T.A. 591, 593 (1932).

The question is reduced to whether the individual petitioners have shown reasonable cause for the untimely filing of the two returns. We conclude that they have not.

With respect to both of the years, Mr. Jimenez offered the excuse that he and his wife were having marital difficulties, and for that reason she refused to divulge to him information that was within her possession and control with respect to the income and expenses of the rental properties. Mr. Jimenez does not argue that he and his wife should be treated differently from one another with respect to the liability for the penalty; they are both petitioners in this proceeding,

and were still married at the time of trial. Also, he does not argue that the returns were not valid joint returns. A situation in which one of the parties to the joint returns causes the lateness of the filing of such returns because of her intentional refusal to divulge necessary information seems to us to be a far cry from a showing that the individual taxpayers, being considered as an economic unit, had reasonable cause for the untimely filing of the returns. In fact, the excuse would certainly seem to *establish* willful neglect on the part of Mrs. Jimenez.

Moreover, the date and signature by the accounting firm on the return for 1961 indicates that such firm had it all prepared as of April 27, 1962, only 12 days after the filing deadline; yet, the return was not filed until nearly 8 months later. The petitioner has offered no explanation whatsoever for this discrepancy; he has not alleged that the return was incomplete at the time the accounting firm signed it, nor has he accused such firm of having any responsibility for the lateness. This unexplained time gap contradicts the petitioner's testimony that the late filing was in fact caused by his wife's refusal to give him information, except to the extent of the first 12 days of the lateness.

In addition, the amount of the Jimenezes' net income from the rental properties was small as compared to their total income, and we think such income could have been estimated with some reasonable accuracy, particularly in light of the facts that, of the two rental properties, one was a house which Mr. Jimenez and his family had used as a personal residence for some years, and the other was a building the rentals from which provided some of the support for Mr. Jimenez's own mother. Such facts cause us to believe that the income and expenses from the properties could not have been completely a mystery to Mr. Jimenez in 1961 and 1962. In 1962, he had the previous year's figures from both rental properties on which to base a reasonable estimate. When the application for an extension of the filing time with respect to the 1962 return was rejected, the petitioner was directed to file his return without further delay, but in fact, his return was not filed until more than 6 weeks after the date of the rejection. In our judgment, the lack of precise data with respect to a relatively insignificant item which the taxpayer should be able to estimate with a reasonable degree of accuracy is not a reasonable cause for a substantial delay in filing.

In arguing this issue, the petitioner cited *John M. Hayes*, 26 T.C.M. 393, 36 P–H. Memo. T.C. par. 67,080 (1967), for the proposition that personal difficulties can constitute reasonable cause for late filing, and *Elizabeth Barker*, 22 T.C.M. 634, 32 P–H. Memo. T.C. par. 63,130 (1963), for the proposition that the failure of adequate communication between spouses can constitute reasonable cause for late filing. Both cases are readily distinguishable from, and wholly inapposite

with respect to, the situation at hand. In *John M. Hayes*, a series of hardships, including physical incapacity of the taxpayers and the inability to obtain any of the necessary records, was found to be reasonable cause. In *Elizabeth Barker*, the sole petitioner was a wife who had been led by her husband into thinking that a joint return had been filed on behalf of both of them, when in fact no return was filed. At the time of the filing deadline, the spouses were living apart. The Court concluded that the wife had reason to believe that the return was in fact filed. In the case at hand, there is no allegation of physical incapacity, total unavailability of records, or an erroneous but reasonable reliance upon a third party.

We hold that the penalties under section 6651(a) for 1961 and 1962 were properly assessed, but their amounts must of course be adjusted appropriately in light of our other holdings.

*Decisions will be entered under Rule 50.*