F. R. MCDOWELL and MAMIE MCDOWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent MCDOWELL RANCHES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McDowell v. Commissioner
Docket Nos. 417-72, 418-72.
United States Tax Court
T.C. Memo 1974-72; 1974 Tax Ct. Memo LEXIS 248; 33 T.C.M. (CCH) 372; T.C.M. (RIA) 74072; March 26, 1974, Filed. John R. Kline, for the petitioners. Craig D. Platz, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
*249 GOFFE, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Petitioner
Docket No.
Taxable Year Ended 4/30
Income Tax Deficiency F. R. and Mamie McDowell
417-72
1966
$12,475.44
F. R. and Mamie McDowell
417-72
1967
3,642.46
F. R. and Mamie McDowell
417-72
1968
4,298.68
McDowell Ranches, Inc.
418-72
1966
2,786.71
McDowell Ranches, Inc.
418-72
1967
730.30
McDowell Ranches, Inc.
418-72
1968
693.11
The cases were consolidated for trial, briefs, and opinion. Certain adjustments made by the Commissioner have either been conceded or were not raised by the petitioners. The following issues are presented for decision: (1) were meals, housing and related items (as well as gasoline and travel expenses incurred by the McDowells) furnished by McDowell Ranches, Inc., to its sole shareholders F. R. and Mamie McDowell, for the benefit and convenience of the corporation allowing it to deduct the cost of providing these items under sections 162 and 167 of the Internal Revenue Code[1] and allowing the McDowells to exclude the beneficial value of meals and lodging under section 119; or *250 were the items merely constructive dividends which are taxable to the McDowells and not deductible by the corporation; and (2) where the McDowells withdrew cash from their wholly owned corporation and used the cash to defray personal expenses and to obtain personal investments, and the corporation treated the withdrawals as open account "advances" with no provision for interest and no ascertainable maturity date, did the parties intend the withdrawals to be nontaxable loans or were they taxable dividends (as defined in section 316) to the McDowells under section 61 of the Internal Revenue Code and nondeductible by the corporation. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by reference. At the time of filing the petitions, petitioners F. R. and Mamie McDowell (husband and wife during all times pertinent and hereafter referred to as the McDowells) resided on a ranch near Wisdom, Montana. Petitioner McDowell Ranches, Inc., (hereafter sometimes referred *251 to as the corporation) was incorporated on April 12, 1962, under the laws of the State of Montana with its principal office located at the McDowells' residence at the time its petition was filed. The corporation was a subchapter S corporation from incorporation until reorganization in 1965.
The McDowells timely filed their joint Federal income tax returns for the taxable years ended April 30, 1966, 1967 and 1968 with the district director of internal revenue at Helena, Montana. The corporation timely filed its Federal income tax returns for the taxable years ended April 30, 1966, 1967 and 1968 with the district director of internal revenue at Helena, Montana. F. R. McDowell was born September 26, 1894, and Mamie McDowell was born June 15, 1897. F. R. McDowell received a fifth-grade education. The McDowells have been ranchers in Montana since 1915. The McDowells and their sons operated the McDowell Ranch as a partnership prior to its incorporation. During the years in question, the corporation was 100 percent owned by F. R. and Mamie McDowell who were the only active officers of the corporation, serving as president and secretary-treasurer, respectively. The corporation *252 owns about 35,000 acres of ranch land in a tract 18 miles long and 8 miles wide. In addition, the ranch leases 3,000 acres of state land and has a permit for grazing about 300 animals. The corporation has over 200 miles of fence line, a main irrigation canal 14 miles long and enough irrigation ditches to irrigate 10,000 acres of land. Of the total acreage, 10,000 acres are under irrigation. In addition to numerous corrals, chutes, and stock scales, some 49 buildings (in the nature of dwelling houses, barns, garages, bunk houses, cook houses, various sheds and a commissary room) are located on the corporation's property. In January 1965, McDowell Ranches, Inc., was reorganized. The reason for the reorganization was the desire and insistence of the McDowell sons, Bob, Mel and Sam, that they each be allowed to run his own ranch. Their insistence stemmed from dissension among the family as to F. R. McDowell's overseeing of what was essentially three separate operations conducted by the three McDowell sons. Each son acquired by gift from F. R. and Mamie McDowell, stock in McDowell Ranches, Inc., which they exchanged for cattle and equipment owned by McDowell Ranches, Inc. Each *253 son then transferred the cattle and equipment so acquired to a corporation in exchange for its stock. The three corporations organized for that purpose were Sam McDowell Cattle Company, the Spokane Ranch and Mel McDowell Ranch. After the transfer of cattle and equipment to the corporations owned by the sons, the assets of McDowell Ranches, Inc., included the ranch land and improvements thereon, 335 calves and heifers and 93 horses. The calves and heifers were disposed of for $35,828.27 during the taxable year ended April 30, 1966 and the horses were to be maintained by the three sons for use in their respective cattle operations. After these transactions, the principal business activity of McDowell Ranches, Inc., was the leasing of its land to the sons' corporations. On January 2, 1965, the McDowell sons, as presidents of their respective wholly owned corporations, each signed agreements providing for the lease of approximately one-third of the McDowell Ranches, Inc., ranch land to each corporation for $15,000 annually. Article I of each lease provides: The property herein leased is that certain unit formerly occupied and managed by [one of the three sons] and known as *254 [that son's] unit, * * * Article VI of each lease provides: The Tenant agrees to use the premises in a manner consistent with good agricultural practices and at its expense will keep the improvements in a good state of repair, and * * * the Landlord shall have the right of inspection of the premises leased. The McDowells were and are very zealous about ensuring that prompt repairs are made. Article VI was included in each lease to provide the McDowells with the right to inspect and oversee each of their sons' ranching operations and to ensure that each of the sons runs his ranch properly. Almost daily during the months of April through November, F. R. McDowell inspects ditches, headgates of the irrigation system and buildings; oversees irrigation operations, spraying of sagebrush, operation of drag lines for clearing irrigation canal; hires painters and roofers for the buildings; and performs some of the tasks connected with irrigation by operating his tractor. He travels to and from Helena to the Union Bank and Trust Company, where the corporation maintains its bank account, and to confer with the corporation's accountants. The sons' lessee corporations, rather than *255 the petitioner-lessor corporation, carried on ordinary ranching activities and were responsible under the leases for the maintenance of the ranch improvements. F. R. and Mamie McDowell were employees of the corporation during the years in issue and were paid salaries which they reported as income on their Federal income tax returns. The McDowells have resided on the ranch property since the beginning of ranch operations; they have continued to so reside since incorporation of McDowell Ranches, Inc., and their sons have also resided in separate homes on the property. All such residences are owned by McDowell Ranches, Inc. During the periods in issue, the McDowells resided on the ranch from April to December of each year and resided the other four months in California. The corporation made available to the McDowells the home which F. R. McDowell built approximately 37 years ago and it claimed deductions for utilities and other expenses incurred or paid by the corporation for the maintenance and upkeep of the home. The deductions claimed on the corporation's income tax returns, all of which are in controversy, are as follows: Taxable Years Ended April 30
1966
1967
1968 Fuel (Propane gas)
$ 707.80
$ 406.68
$ 568.50
Food
519.24
444.33
375.10
Telephone
207.61
190.63
179.11
Utilities
60.00
60.00
60.00
Travel
467.35
439.71
270.70
Gas and Oil (50%)
161.76
79.35
291.53
Depreciation - House, Well and Garage
1,065.86
1,065.86
1,065.86
Depreciation - Washer, Refrig., Blender, Dryer, Carpet
-0-
-0-
131.33
TOTAL
$3,189.62
$2,686.56
$2,942.13
*256 The item for food represents food consumed by the McDowells in the eight months they resided on the ranch. A minimum amount of propane gas was used in the corporation's house during the four months the McDowells were in California. It was more expedient to maintain minimum heat in the house than to drain the water pipes. The telephone maintained in the residence occupied by the McDowells was used for both business and social purposes. Wisdom, Montana, is a small town consisting of about 150 people surrounded by land owned by the corporation. Except for Wisdom, Butte and Hamilton are the nearest towns to the corporation and each is approximately 80 miles distant. If the McDowells did not reside in the corporation's residence, it could not be rented to anyone in Wisdom, Montana. F. R. McDowell does not understand accounting concepts nor can he interpret a balance sheet. F. R. McDowell relied completely on his lawyer and accountant to handle the corporation's legal and accounting matters since he does not fully understand the concept of a corporation as a separate entity. Prior to incorporation of the ranch, it operated as a partnership and the McDowells regularly withdrew *257 cash from the partnership account at the Union Bank and Trust Company, Helena, Montana, as needed to pay both the operating expenses of the ranch and their personal expenses. After incorporation of the ranch in 1962, the McDowells opened a corporate account at the same bank and a personal account at the Miners Bank, Butte, Montana. Withdrawals were made by the McDowells from the Union Bank corporate account to pay both operating and personal expenses during the years in controversy. The McDowells made withdrawals from the Miners Bank for personal expenses except on one or two occasions when withdrawals were made to pay ranch expenses. After the reorganization of the corporation in 1965, the McDowells continued to withdraw substantial sums of cash for their personal use from the corporate account at Union Bank and Trust Company. These withdrawals were not secured by promissory notes but were recorded as loans to shareholders on the books of the corporation. The amounts of these personal withdrawals, less various offsetting credit adjustments reflected on the corporate books, were $40,468.07, $13,724.87 and $8,842.12 for the taxable years ended April 30, 1966, 1967 and 1968, respectively. *258 Notes were prepared by the McDowells' attorney after examination of the income tax returns by the Internal Revenue Service, but they were not executed. On April 30, 1968, the total of the McDowells' personal withdrawals for the years in controversy and prior years totaled $98,888.25, an increase of approximately $63,000 during the periods in controversy. Subsequent to being examined by the Internal Revenue Service, the McDowells repaid in full without interest the amounts withdrawn as follows: Balance 4/30/68
$ 98,888.25
5/1/70
Adjustment as of 9/16/65 to segregate McDowell Ranches, Inc., assets from those of F. R. & Mamie McDowell, now in separate Agency Account at Union Bank & Trust Co., in name of McDowell Ranches, Inc.
$30,710.88
2/14/69
Annuity payment from Sam McDowell applied on 4/30/68 balance
6,239.30
1/28/70
Annuity payment from Sam McDowell applied on 4/30/68 balance
6,239.30
1/18/71
Proceeds Western Life Insurance policies applied on 4/30/68 balance
52,794.81
2/1/71
Annuity payment from Sam McDowell applied on 4/30/68 balance
6,239.00
( $102,223.29 )
Excess payments applied to 4/30/69 advances
( 3,335.04 )
*259 Withdrawals and repayments subsequent to 4/30/68 were as follows: 4/30/69
Advances
$20,583.96
Excess of 2/1/71 repayment applied
$ 3,335.04
4/30/71
Dividends Fy. 4/30/71
McDowell Ranches applied
5,100.80
( 8,435.84 )
Balance owing on
4/30/69 advances
12,148.12
4/30/70 advances
3,401.79
4/30/71 advances
28,575.34
Balance owing 4/30/71
$44,125.25
4/30/72
Prepayments
Sept. 1971 - C.D.'s transferred to corporation
40,000.00
April 1971 - Dividends applied to loan
7,651.20
Dec. 1971 - salary increase 5/1 - 12/31/71 applied to loan
4,225.00
(51,876.20)
Additional charges Income Taxes, F.I.C.A.
1,893.99
C.D. Interest (Corp.) deposited in personal account
687.50
Rent - auto
400.00
Dividends credited by Union Bank
75.88
Other payment
977.68
4,035.05
Corp. owes McDowells
($3.715.90)
The advances were repaid to the corporation after the McDowells' attorney instructed them to do so, and the McDowells have now discontinued the practice of taking advances from the corporation. The corporation declared no dividends during the years in issue. The McDowells considered *260 the account from which the funds were withdrawm as their own and had no intention at the time of making the withdrawals of repaying the amounts withdrawn. Of the $40,468.07 withdrawn by the McDowells in the taxable year ending April 30, 1966, $30,000 was used to purchase corporate securities. The securities were purchased on September 16, 1965, in the name of the Union Bank and Trust Company, Helena, Montana, as agent for F. R. and Mamie McDowell. The remaining withdrawals by the McDowells during the periods in controversy were used for personal living expenses. The McDowells reported all dividend income received from the securities referred to in the preceding paragraph on their income tax returns for the years in question. On May 21, 1970, the securities referred to above were transferred, at the request of the McDowells, to a new agency account in the name of the corporation. The details of the transfer were handled by the McDowells' attorney to reflect the correct ownership of the securities. The McDowells, as individuals, had reported the dividends as income for tax purposes; therefore, their accountant adjusted the corporation's books to record the dividends as having *261 been paid by the corporation to the McDowells. At all times during the taxable years ended April 30, 1966 through April 30, 1971, the McDowells had sufficient personal funds to repay the advances from the corporation. ULTIMATE FINDINGS OF FACT 1. The services performed for the ranch by the McDowells could not be performed if they did not reside on the ranch. 2. The McDowells resided on the ranch for the convenience of the corporation and the personal benefit derived by them was incidental. 3. The withdrawals of cash by the McDowells from the corporation represented dividends not loans. OPINION The two issues presented for our decision are as follows: (1) were meals, lodging and related items paid or incurred by petitioner corporation, McDowell Ranches, Inc., for the benefit of its shareholders, F. R. and Mamie McDowell, furnished for the convenience of the corporation and thus deductible by the corporation and excludable from the income of the shareholders; and (2) were withdrawals of cash by the shareholders from the corporation for personal use nontaxable loans or constructive dividends? Both of the issues are questions of fact. Petitioners F. R. and Mamie *262 McDowell are the shareholders of McDowell Ranches, Inc. They are also the principal officers and employees. The corporation owns 35,000 acres of ranch land in Montana which it leases to corporations wholly owned by sons of the McDowells. During the years in issue, the only business activity of the corporation was leasing land. The corporations owned by the sons engage in ranching operations on the land. The property includes $10,000 acres of land under irrigation. The leases provide that the tenant corporations will operate the premises in accordance with good agricultural practices and will keep the improvements in a good state of repair. The landlord corporation retained the right to inspect the leased property. The McDowells resided on the ranch which is located approximately 80 miles from other available housing. They resided there from April through December and resided the other four months of the year in California. The expenses of maintaining the McDowell residence and depreciation thereon, detailed in our findings of fact, were deducted by the corporation but were not included in the income of the McDowells. They contend that such expenses represent the cost *263 of meals and lodging furnished on the premises of their employer, the corporation, for the convenience of the employer and are thus excludable from gross income under the provisions of section 119. The respondent, consistent with the adjustments he made in his statutory notice of deficiency, contends that the expenses are not deductible by the corporation and are includable in the income of the shareholders because they represent constructive dividends. The amounts claimed are not in dispute. Respondent points out that the corporation had only one business activity, leasing ranch land to other corporations, and the leases imposed duties on the lessees to use the premises in accordance with good agricultural practices and to keep the improvements in a good state of repair. Petitioners argue that it was necessary for the corporation to retain someone on the ranch to inspect the irrigation system, to supervise the sagebrush eradication program and to insure that the lessees complied with the terms of the leases. Meals and lodging furnished for the convenience of the employer, under certain conditions, are excludable from the gross income of the employee. Sec. 119. [2]
*264 To be excludable, meals and lodging must be furnished on the business premises of the employer and they must be furnished for the convenience of the employer. In addition, the value of lodging may be exluded only if the employee must accept such lodging as a condition of employment. Sec. 1.119-1(a) and Sec. 1.119-1(b), Income Tax Regs.
In his reply brief, respondent for the first time argues that the meals cannot be excluded from the McDowells' income because they were prepared by the McDowells from food purchased at the grocery store, citing Michael A. Tougher, Jr., 51 T.C. 737 (1969), affd. 441 F.2d 1148 (C.A. 9, 1971). There is no evidence in the record as to the preparation of the meals. Such contention by the respondent is obviously an afterthought. It was not mentioned in the opening statement nor did counsel for respondent attempt, during the trial, to establish who prepared the meals. Raising such a theory for the first time on reply brief not only deprives petitioners of making an argument against it, but also deprives *265 petitioners of ascertaining the facts during the trial. The rudimentary principles of equity and justice forbid our consideration of this argument. Theatre Concessions, Inc., 29 T.C. 754, 760 (1958), acq. 1958-2 C.B. 8. There is no question that the meals and lodging were furnished on the business premises of the employer-corporation, the ranch. To decide whether the meals and lodging were furnished for the convenience of the employer, we have carefully considered the entire record. While we are cognizant of the relationships of the parties and the obligations imposed by the lease agreements, we are also mindful that the ranch had 35,000 acres, 10,000 of which were under irrigation. The ranch also had other substantial physical improvements. Because of the danger of irreparable harm from a damaged irrigation ditch and the possibility of vandalism to buildings located some 80 miles from the nearest town, we conclude that a prudent lessor, unrelated to the lessees, would retain a caretaker on such property. During the four winter months when the irrigation *266 system was not in use, the need for a caretaker would be greatly reduced. We hold, therefore, that the meals and lodging were furnished to the McDowells for the convenience of their corporate employer. The value of the lodging is excludable only if the employee is required to occupy such quarters as a condition of employment. Sec. 1.119-1(a) (2), Income Tax Regs. If the employee could not perform such duties unless he is furnished such lodging, he has satisfied the necessary test for exclusion. Sec. 1.119-1(b), Income Tax Regs. We conclude it was necessary for the McDowells to reside on the premises to carry out the necessary duties. Accordingly, we hold that the McDowells may exclude from income the following meals and lodging items which the Commissioner determined to be income to them: Taxable Years Ended April 30
1966
1967
1968 Fuel (Propane gas)
$ 707.80
$ 406.68
$ 568.50
Food
519.24
444.33
375.10
Telephone
207.61
190.63
179.11
Utilities
60.00
60.00
60.00
Depreciation - House, Well and Garage
1,065.86
1,065.86
1,065.86
Depreciation - Washer, Refrig., Blender, Dryer, Carpet
-0-
-0-
131.33
TOTAL
$2,560.51
$2,167.50
$2,379.90
*267 We likewise hold that the above items are deductible by the corporation as ordinary and necessary business expenses. In addition to the items listed above, the Commissioner, in his statutory notice of deficiency, determined that the following items were includable in the income of the McDowells and determined that they were not deductible by the corporation as ordinary and necessary expenses: Taxable Years Ended April 30
1966
1967
1968 Travel
$467.35
$439.71
$270.70
Gas and Oil (50%)
161.76
79.35
291.35
TOTAL
$629.11
$519.06
$562.05
The items for travel, gas and oil cannot be excluded by the McDowells from gross income under section 119 because they do not constitute meals or lodging. The only evidence offered by petitioners concerning such items was the testimony of Mrs. McDowell as to the use of various automobiles on the ranch and a vague statement that the bulk of the oil and gas was attributable to the Mercury. The evidence offered is insufficient to prove the deductions to be ordinary and necessary business expenses of the corporation and they are, therefore, disallowed. Challenge Manufacturing Co., 37 T.C. 650 (1962). *268 The evidence is likewise insufficient to overcome the presumptive correctness of the Commissioner's determination that such items constituted constructive dividends to the McDowells. Challenge Manufacturing Co., supra. The remaining issue is whether withdrawals of cash from the corporation by its shareholders, the McDowells, constituted loans or dividends. The Commissioner determined that the following amounts of cash withdrawals represented dividends: Taxable Year Ended April 30
Amount 1966
$40,468.07
1967
13,724.87
1968
8,842.12
Whether the withdrawals constitute loans or dividends is a factual question determined from all the surrounding facts and circumstances. Chism's Estate v. Commissioner, 322 F.2d 956 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Electric & Neon, Inc., 56 T.C. 1324 (1971). When the individual withdrawing funds from the corporation also controls it, such situation invites special scrutiny. Jack Haber, 52 T.C. 255, 266 (1969), affirmed per curiam 422 F.2d 198 *269 (C.A. 5, 1970); Elliot J. Roschuni, 29 T.C. 1193, 1201-1202 (1958), affd. 271 F.2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960). It is relevant to inquire whether the alleged lender had a good faith intent to enforce the repayment of the disbursed funds. Anson Beaver, 55 T.C. 85, 91 (1970); Irving D. Fisher, 54 T.C. 905, 910 (1970). Our findings of fact reflect numerous facts to be considered in ascertaining the intent of the parties at the time of the withdrawals. No single fact is determinative. The corporation was wholly owned by the McDowells. During the periods in question, the balance of the McDowells' withdrawals increased by approximately $63,000. Although the withdrawals were reflected on the corporate books and records as "Due [from] Officers' Employees," no notes were executed and no interest was paid or security given. Except for the $30,000 withdrawn to purchase securities, the withdrawals consisted of numerous small checks written on the corporate bank account for personal living expenses. Notwithstanding the fact that the McDowells' net worth at all times far exceeded the amount *270 of withdrawals, prior to audit by the Internal Revenue Service, the only payment on the alleged loans consisted of small book entry credits by accountants for unpaid salaries and a $6,000 audit entry for an annuity check inadvertently deposited by F. R. McDowell to the corporate account. During the period between incorporation of McDowell Ranches and the end of the last taxable year in controversy, no dividends were declared or paid by the corporation. In addition, F. R. McDowell's direct testimony shows that during the periods in controversy he did not fully understand the effect of incorporating McDowell Ranches and, thus, considered its property to be his property. Mr. McDowell did not understand accounting principles much less the significance of the receivable setup on the corporation's books and the payable setup on his personal financial statements in order to reflect the alleged debtor-creditor relationship. Mr. McDowell's testimony shows that he considered the amounts withdrawn to be his property and that neither he, nor his alter ego corporation, ever intended to create a bona fide indebtedness at the time the funds were withdrawn. We reject petitioners' argument *271 that the McDowells' withdrawals must be deemed loans because under the Montana Code [3] they were liable as officers of the corporation for the amount of withdrawals upon their failure to formally declare a dividend. The existence of a legal obligation to repay is not controlling. Whether a withdrawal is a loan depends upon the existence of an intent of the parties at the time the withdrawal is made that it shall be repaid. Chism's Estate, supra; Electric & Neon, supra.
On the basis of the entire record before us, we find that the McDowells' cash withdrawals from the corporation were constructive dividends rather than loans. Thus, we hold for respondent on this issue. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER. There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if - (1) in the case of meals, the meals are furnished on the business premises of the employer, or (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment. In determining whether meals or lodging are furnished for the convenience of the employer, the provisions of an employment contract or of a State statute fixing terms of employment shall not be determinative of whether the meals or lodging are intended as compensation. ↩
3. See R.C.M. sections 15-2240 and 15-2242 (1947). ↩