T.C. Memo. 1996-218


UNITED STATES TAX COURT


M.S. FOOD STORES, INC., Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

FREDERICK MALCOLM SUTTON AND CAROLYN P. SUTTON, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11631-93, 11632-93.          Filed May 6, 1996.


A. Rexford Willis III, for petitioners.

James R. Rich, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARKER, Judge: Respondent determined deficiencies in Federal corporate income taxes, additions to tax, and a penalty for petitioner M.S. Food Stores, Inc., as follows:

| Taxable Year Ending | Deficiency | Additions to Tax Under Section | | | | Penalty |
|---|---|---|---|---|---|---|
| | | 6653(b)(1) | 6653(b)(2) | 6653(b)(1)(A) | 6653(b)(1)(B) | 6663 |
| Sept. 30, 1986 | $3,022 | $1,511 | * | --- | --- | --- |
| Sept. 30, 1987 | 7,542 | --- | --- | $5,657 | * | --- |
| Sept. 30, 1988 | 61,367 | --- | --- | 46,025 | * | --- |
| Sept. 30, 1989 | 1,284 | 963 | --- | --- | --- | --- |
| Sept. 30, 1990 | 22,029 | --- | --- | --- | --- | $16,522 |

*Plus an addition of 50 percent of the interest due on the deficiency.

In the alternative, respondent determined additions to tax and a penalty as follows:

| Taxable Year Ending | Additions to Tax Under Section | | | | | | Penalty |
|---|---|---|---|---|---|---|---|
| | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6653(a)(1) | 6653(a)(2) | 6661 | 6662(a) |
| Sept. 30, 1986 | --- | --- | --- | $151 | * | --- | --- |
| Sept. 30, 1987 | $1,506 | $377 | * | --- | --- | --- | --- |
| Sept. 30, 1988 | 5,985 | 3,068 | * | --- | --- | $15,342 | --- |
| Sept. 30, 1989 | --- | --- | --- | 64 | --- | --- | --- |
| Sept. 30, 1990 | --- | --- | --- | --- | --- | --- | $4,406 |

*Plus an addition of 50 percent of the interest due on the deficiency.

Respondent determined deficiencies in Federal income taxes, additions to tax, and penalties for petitioners Frederick Malcolm Sutton and Carolyn P. Sutton as follows:

| Year | Deficiency | Additions to Tax Under Section | | | |
|---|---|---|---|---|---|
| | | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6653(a)(1) |
| 1986 | $25,141 | --- | $8 | [1] | --- |
| 1987 | 48,241 | $1,182 | 496 | [2] | --- |
| 1988 | 31,139 | 841 | --- | --- | $368 |
| 1989 | 24,860 | 6,354 | --- | --- | --- |
| 1990 | 23,716 | 5,947 | --- | --- | --- |

| Year | Additions to Tax Under Section | | | | Penalty |
|---|---|---|---|---|---|
| | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b)(1) | 6661 | 6663 |
| 1986 | $18,742 | [3] | --- | --- | --- |
| 1987 | 29,787 | [4] | --- | $3,597 | --- |
| 1988 | --- | --- | $18,590 | 2,651 | --- |
| 1989 | --- | --- | --- | --- | $15,905 |
| 1990 | --- | --- | --- | --- | 17,787 |

[1] Plus an addition of 50 percent of the interest due on $103.
[2] Plus an addition of 50 percent of the interest due on $5,309.
[3] Plus an addition of 50 percent of the interest due on $24,989.
[4] Plus an addition of 50 percent of the interest due on $38,317.

In the alternative, respondent determined additions to tax and penalties as follows:

| | Additions to Tax Under Section | | | | | Penalty |
|------|------------|----------------|----------------|-------------|---------|---------|
| Year | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6653(a)(1) | 6661 | 6662(a) |
| 1986 | --- | $1,257 | * | --- | $6,285 | --- |
| 1987 | $11,111 | 2,482 | * | --- | 12,060 | --- |
| 1988 | 7,038 | --- | --- | $1,607 | 7,785 | --- |
| 1989 | 6,354 | --- | --- | --- | --- | $4,972 |
| 1990 | 5,947 | --- | --- | --- | --- | 4,743 |

*Plus an addition of 50 percent of the interest due on the deficiency.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues remaining for decision are:

(1) Whether petitioner M.S. Food Stores, Inc. (the corporate petitioner), had unreported income from rebates and coupons in its taxable years ending September 30, 1987, 1988, 1989, and 1990;

(2) whether the corporate petitioner had unreported gross receipts in its taxable years ending September 30, 1987, 1988, 1989, and 1990;

(3) whether the corporate petitioner is liable for additions

---

[1] On brief respondent has conceded the fraud additions to tax and penalties for all years before the Court. Respondent has also conceded that petitioner Carolyn P. Sutton is an innocent spouse as to the unexplained bank deposits and disputed rebate and coupon checks diverted from the corporate petitioner (grossly erroneous items). Respondent further conceded that petitioner Carolyn P. Sutton is an innocent spouse as to any additions to tax predicated upon those income adjustments, provided that the Court determines that the substantial understatements are in amounts sufficient to satisfy the statutory requirements of sec. 6013(e)(1) through (4). The parties have made various other concessions which are set out in their stipulations of fact and which will be discussed in the text below.

to tax under section 6651(a)(1) for its taxable years ending September 30, 1987, and 1988;

(4) whether the corporate petitioner is liable for additions to tax for negligence for its taxable year ending September 30, 1986, under section 6653(a)(1) and (2); for its taxable years ending September 30, 1987, and 1988, under section 6653(a)(1)(A) and (B); and for its taxable year ending September 30, 1989, under section 6653(a)(1); and for an accuracy-related penalty for negligence for its taxable year ending September 30, 1990, under section 6662(a);

(5) whether the corporate petitioner is liable for an addition to tax under section 6661 for its taxable year ending September 30, 1988;

(6) whether petitioners Frederick Malcolm Sutton and Carolyn P. Sutton (the Suttons) had unreported income, in the taxable years 1986, 1987, 1988, and 1990, from rebate and coupon checks diverted from the corporate petitioner;

(7) whether the Suttons had additional unreported income, in the taxable years 1986 through 1990, from diverted corporate funds (unexplained bank deposits);

(8) whether the Suttons are liable for additions to tax under section 6651(a)(1) for the taxable years 1987 through 1990;

(9) whether the Suttons are liable for additions to tax for negligence for the taxable years 1986 and 1987 under section 6653(a)(1)(A) and (B); and for the taxable year 1988 under

section 6653(a)(1); and for accuracy-related penalties for negligence for the taxable years 1989 and 1990 under section 6662(a); and

(10) whether the Suttons are liable for additions to tax for the taxable years 1986, 1987, and 1988 under section 6661.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

The corporate petitioner had its principal place of business in Kinston, North Carolina, at the time it filed its petition. The Suttons resided in Kinston, North Carolina, at the time they filed their petition. The cases have been consolidated for trial, briefing, and opinion.

The corporate petitioner operated a retail grocery store in Kinston, North Carolina, during the years at issue. Petitioner Frederick Malcolm Sutton (Mr. Sutton) owned 100 percent of the stock of the corporate petitioner. Previously, his father, Frederick Sutton (Fred Sutton), had owned and operated the grocery business. Mr. Sutton began working with his father at the store when he was approximately 11 years old.

Mr. Sutton is a high school graduate and took some community college courses in grocery management and butchering and meat cutting. Mr. Sutton has no education or training in accounting,

tax, or financial matters.

During the years 1986 through 1989, Mr. Sutton maintained a personal checking account at NCNB National Bank (NCNB). During the years 1989 and 1990, the Suttons maintained a personal checking account at First Citizens Bank & Trust Company (FCB). The corporate petitioner had both checking and savings accounts at FCB during its taxable years ended September 30, 1987 through 1990. The bank statements covering the periods at issue for all of the above checking accounts show numerous charges for checks returned for insufficient funds.

Rebates and Coupons

The corporate petitioner received rebate checks from various wholesalers or vendors. Fred Sutton had initiated an accounting procedure for the rebate checks whereby the amounts of such rebate checks were to be recorded on the corporate petitioner's sales summaries (known, and hereinafter referred to, as the green sheets) in a column entitled "Rebates". The corporate petitioner's accountant reduced cost of sales by a credit adjustment to purchase expenses; i.e., deducting the amount of the rebates from the purchase expenses.

The corporate petitioner accepted coupons from its customers. The total cost of a grocery item was initially rung up on the cash register, and then the coupon amount was rung up on the cash register as a deduction from the customer's bill, with the customer paying the balance. The coupon amount was

deducted on the cash register tape, but the coupons themselves were never added up by the corporate petitioner. Periodically, after the corporate petitioner accumulated enough coupons to fill a large grocery bag about two-thirds full, it sent such coupons to its wholesaler or vendor who would issue a check to the corporate petitioner for the amount of the coupons. The corporate petitioner did not record the receipt of these coupon checks on its books. Judy Stroud of the accounting firm of Woolard & Hale, the corporate petitioner's accountant, could not recall ever discussing the accounting treatment of coupons and did not appear to have any knowledge about the corporate petitioner's treatment of the coupons or the coupon checks.

The corporate petitioner received checks for rebates from five wholesalers or vendors during its taxable years ended September 30, 1987 through 1990: Quinn Wholesale Company, Inc. (Quinn), Eastern Coca Cola Bottling Company (Coke), Carolina Dairies Corporation (Carolina Dairies), Philip Morris, and Nash Finch Company (Nash Finch). Quinn and Nash Finch issued checks for both rebates and coupons. Mr. Sutton indicated that the only way he could distinguish the rebate checks from the coupon checks was by the wholesaler's or vendor's name. Only half of the rebate checks were recorded on the corporate petitioner's books. In a few instances, rebate checks had been credited toward the corporate petitioner's purchase account with the vendor. Approximately one-third of the coupon checks were recorded on the

corporate petitioner's books as rebates.

Many of these coupon and rebate checks were deposited into the corporate petitioner's bank account. A coupon check issued by Quinn on August 26, 1988, in the amount of $502.44, was deposited in the corporate petitioner's bank account on August 30, 1988, along with $500 in currency; change of $2.44 was returned. That amount of $502.44 was not included in the notice of deficiency as part of the corporate petitioner's unreported rebate amounts because it had been reported on the corporate petitioner's tax return. However, respondent included this $502.44 as part of an unexplained corporate bank deposit made on August 30, 1988.

The following chart sets out the source, amounts, and disposition of the various rebate and coupon checks included in the deficiency notice to the corporate petitioner:

Rebate/Coupon Checks:  the Corporate Petitioner

| TYE | Vendor | Amount in Deficiency Notice | Amount Credited on Vendor's Account (Conceded by Respondent) | Amount Deposited in Corporate Bank Account | Amount Cashed |
|---|---|---|---|---|---|
| 9-30-87 | Quinn | $11,420.62 | -0- | $4,316.44 | $7,104.18 |
| | Coke | 4,138.00 | $2,988.00 | 1,150.00 | -0- |
| | Carolina Dairies | 447.72 | -0- | 132.48 | 315.24 |
| | Total: | $16,006.34 | $2,988.00 | $5,598.92 | $7,419.42 |
| 9-30-88 | Quinn | $10,647.07 | -0- | $4,413.88 | $6,233.19 |
| | Coke | 11,083.75 | $1,625.00 | 9,458.75 | -0- |
| | Carolina Dairies | 1,757.86 | -0- | 1,757.86 | -0- |
| | Philip Morris | 819.00 | -0- | 819.00 | -0- |
| | Total: | $24,307.68 | $1,625.00 | $16,449.49 | $6,233.19 |
| 9-30-89 | Quinn | $2,195.21 | $1,338.69 | $502.39 | $354.13 |
| | Coke | 5,190.00 | 1,625.00 | 3,565.00 | -0- |
| | Carolina Dairies | 298.92 | -0- | 298.92 | -0- |
| | Philip Morris | 372.00 | -0- | 372.00 | -0- |
| | Total: | $8,056.13 | $2,963.69 | $4,738.31 | $354.13 |
| 9-30-90 | Coke | $10,392.50 | $5,045.00 | $5,347.50 | -0- |
| | Philip Morris | 1,080.00 | -0- | 1,080.00 | -0- |
| | Nash Finch | 9,088.75 | 4.92 | 8,334.64 | $749.19 |
| | Total: | $20,561.25 | $5,049.92 | $14,762.14 | $749.19 |

The record does not disclose what happened to the proceeds of the above rebate/coupon checks that were cashed. The record does not disclose whether the above rebate/coupon checks that were deposited in the corporate bank account were part of the store deposits or part of the unexplained bank deposits.

The following chart sets out the source, amounts, concessions by respondent, and disputed amounts of rebate/coupon checks included in the deficiency notice issued to the Suttons:

Rebate/Coupon Checks: the Suttons

| Year | Vendor | Amount in Deficiency Notice | Amount Conceded by Respondent | Amount Still in Dispute |
|------|--------|-----------------------------|-------------------------------|-------------------------|
| 1986 | Quinn | $6,279.00 | $1,473.79 | $3,833.81 |
|      |        |           |           | 971.40 |
|      | Coke | 2,088.00 | 1,875.50 | 212.50 |
|      | Carolina Dairies | 244.00 | 244.00 | -0- |
|      |        | $8,611.00 | $3,593.29 | $5,017.71 |
| 1987 | Quinn | $13,699.30 | $2,636.85 | $11,062.45 |
|      | Coke | 3,326.00 | 3,326.00 | -0- |
|      | Carolina Dairies | 448.00 | 132.76 | 315.24 |
|      | Philip Morris | 273.00 | 273.00 | -0- |
|      |        | $17,746.30* | $6,368.61 | $11,377.69 |
| 1988 | Quinn | $8,288.00 | $5,658.95 | $2,629.05 |
|      | Coke | 12,709.00 | 12,709.00 | -0- |
|      | Carolina Dairies | 2,021.00 | 2,021.00 | -0- |
|      | Philip Morris | 546.00 | 546.00 | -0- |
|      |        | $23,564.00 | $20,934.95 | $2,629.05 |
| 1989 | Quinn | $1,841.00 | $1,841.00 | -0- |
|      | Coke | 5,348.00 | 5,348.00 | -0- |
|      | Carolina Dairies | 36.00 | 36.00 | -0- |
|      | Philip Morris | 372.00 | 372.00 | -0- |
|      |        | $7,597.00 | $7,597.00 | -0- |
| 1990 | Coke | $8,610.00 | $8,610.00 | -0- |
|      | Philip Morris | 1,080.00 | 1,080.00 | -0- |
|      | Nash Finch | 9,113.00 | 8,363.81 | $749.19 |
|      |        | $18,803.00 | $18,053.81 | $749.19 |

*The rebate amount in the deficiency notice is $16,516 for 1987, the amount from Quinn that year being erroneously listed as $12,469 rather than the $13,699.30.

The amounts still in dispute represent checks made out to the corporate petitioner that were cashed by Mr. Sutton.

The following rebate or coupon checks made out to the corporate petitioner were cashed by Mr. Sutton:

| Issuer | Date of Check | Amount | Disposition |
|--------|---------------|--------|-------------|
| Quinn | 01-22-86 | $3,833.81 | $833.81 deposited in Mr. Sutton's personal NCNB account, $3,000 in cash withheld by Mr. Sutton |
| | - -86 | 971.40 | $900 deposited into Mr. Sutton's personal NCNB account, $71.40 in cash withheld by Mr. Sutton |
| | 01-01-87 | 1,354.35 | $1,000 deposited in Mr. Sutton's personal NCNB account, $354.35 in cash withheld by Mr. Sutton |
| | 01-26-87 | 1,363.41 | Cashed by Mr. Sutton |
| | 03-16-87 | 1,451.04 | Cashed by Mr. Sutton |
| | 04-23-87 | 1,032.40* | Cashed by Mr. Sutton |
| | 08-14-87 | 1,047.67 | Cashed by Mr. Sutton |
| | 09-18-87 | 1,355.31 | Cashed by Mr. Sutton |
| | 10-16-87 | 868.41 | Cashed by Mr. Sutton |
| | 12-11-87 | 3,089.86 | Cashed by Mr. Sutton |
| | 01-22-88 | 1,379.27 | Cashed by Mr. Sutton |
| | 04-01-88 | 895.65 | Cashed by Mr. Sutton |
| | 11-15-88 | 354.13 | Cashed by Mr. Sutton |
| Coke | 05- -86 | 212.50 | Cashed by Mr. Sutton |
| Carolina Dairies | 08-05-87 | 315.24 | Cashed by Mr. Sutton |
| Nash Finch | 03-16-90 | 749.19 | Cashed by Mr. Sutton |

*$500 of this amount was reported on the corporate return and only $532.40 was taxed to the Suttons.

The record does not show what happened to the proceeds of these rebate and coupon checks. The Suttons did not report any of these amounts on their individual tax returns.

Checks to or on Behalf of the Corporate Petitioner

During the calendar years 1986 through 1990, Mr. Sutton wrote personal checks to, or for the benefit of, the corporate petitioner as summarized below.[2]

| Year | Deposited in Corporate Bank Account | Cashed | Written to Vendor | Disposition Unknown | Total Amount |
|------|-------------------------------------|--------|-------------------|---------------------|--------------|
| 1986 | $84,400 | $2,900 | --- | $17,500 | $104,800 |
| 1987 | 113,500 | 21,000 | $2,000 | --- | 136,500 |
| 1988 | 51,832 | --- | --- | --- | 51,832 |
| 1989 | 45,651 | --- | 2,606 | 1,000 | 49,257 |
| 1990 | 39,625 | 2,000 | 900 | 1,500 | 44,025 |

A few of these checks were written to third parties; the majority were payable to "Sutton Food Stores" and were deposited in the corporate petitioner's bank account. Many of the checks

---

[2] Amounts are rounded to the nearest whole dollar.

deposited in the corporate petitioner's bank account were part of the store deposits; i.e., those deposits into the corporate petitioner's checking acount that were recorded as deposits on the green sheets. Accordingly, those amounts are not part of the unexplained bank deposits of the corporate petitioner. Among the checks included above, those checks relating to deposits other than the store deposits include the following:[3]

| Date | Check Number | Amount |
|------|--------------|--------|
| 05-19-89 | 0109 | $3,000 |
| 11-24-89 | 0195 | 3,000 |
| 12-01-89 | 0203 | 4,000 |
| 12-21-89 | | 10,000 |
| 12-29-89 | | 20,000 |

As to his personal checks to the corporate petitioner that were cashed, Mr. Sutton did not know the specific disposition of the proceeds of those personal checks.

Fred Sutton also wrote checks to the corporate petitioner which, during the years before the Court, included the following.

| Date | Amount |
|------|--------|
| 08-19-88 | $10,000 |
| 04-21-90 | 500 |
| 09-20-90 | 11,000 |

On August 19, 1988, the corporate petitioner made a deposit of $10,000 to its bank account in addition to the store deposit for that date. We cannot determine that the other two checks from

---

[3] We have not included those checks where it is clear that respondent either did not include the related deposits in the unexplained deposits or has conceded them.

Fred Sutton were deposited into the corporate account other than as part of the store deposits.

Personal Resources

Mr. Sutton claimed that he obtained personal loans from Charles W. Palmer, an elderly man who has known Mr. Sutton for the latter's entire life. Mr. Palmer did not charge Mr. Sutton interest on these alleged loans, although Mr. Palmer did charge interest to others to whom he made loans. These loans were allegedly made in cash by Mr. Palmer and repaid in cash by Mr. Sutton.

Mr. Sutton testified that he would write a check to Mr. Palmer for the amount of the loan, that Mr. Palmer would hold that check until the loan was repaid, that on the back of that check, the dates and amounts of Mr. Sutton's payments would be recorded,[4] and that, usually, the payments were weekly and in amounts of $500, but sometimes they would be $1,000. Neither Mr. Palmer nor Mr. Sutton had any contemporaneous records of these alleged loans. Once a loan was repaid, Mr. Palmer allegedly would return the check to Mr. Sutton, and Mr. Sutton would tear

---

[4] Mr. Sutton testified that Mr. Palmer recorded the payments on the back of the check. Mr. Palmer testified that he never wrote anything, and that Mr. Sutton kept the checks and made the payment notations. The Court did not believe the testimony of either Mr. Palmer or Mr. Sutton in regard to these alleged loans. Mr. Palmer testified that he kept up to $100,000 in a metal box and that he lent out money from that box over and over again without any interest. The Court found his testimony to be inherently incredible.

it up.  In two instances, Mr. Sutton wrote checks to Mr. Palmer, both dated January 15, 1988, and both in the amount of $5,000, which Mr. Palmer negotiated in March and June of 1988.

Mr. Sutton wrote the following checks from the Suttons' personal checking accounts which were endorsed by Mr. Palmer:

| Date | Payee | Amount | Negotiated |
|------|-------|--------|------------|
| 01-15-88 | Charlie Palmer | $5,000 | 03-10-88 |
| 01-15-88 | Charlie Palmer | 5,000 | 06-02-88 |
| 11-24-89 | Cash | 500 | On or before 11-27-89 |
| 12-15-89 | Cash | 500 | On or before 12-18-89 |
| 12-22-89 | Cash | 500 | On or before 12-22-89 |
| 12-29-89 | Cash | 500 | 12-29-89 |
| 01-05-90 | Cash | 500 | On or before 01-08-90 |
| 01-11-90 | Cash | 500 | On or before 01-12-90 |

The Court is not persuaded that Mr. Palmer made any loans to Mr. Sutton.  See supra note 4.

Mrs. Sutton's father died on January 1, 1987.  Mrs. Sutton was the sole beneficiary of his estate (the estate) which had a net value of $408,093.34.  Mr. Sutton was the executor of the estate.

Mrs. Sutton received four distributions from the estate's checking account totaling $100,000 that she loaned to the corporate petitioner.  Of this amount, $90,000 was deposited in the corporate petitioner's bank account during January of 1987.  Whether or when the remaining $10,000 was deposited is not shown by the record.  Mrs. Sutton received another $2,500 distribution from the estate on March 31, 1987, which was deposited in the corporate petitioner's checking account.  Other distributions from the estate were as follows; the date of distribution and

disposition are stated where known:

| Date | Amount | Disposition |
|------|--------|-------------|
| 01-18-87 | $11,690.38 | Paid to FCB |
| 02-17-87 | 3,000.00 | Cashed |
| 03-24-87 | 5,000.00 | Cashed |
| 04-14-87 | 7,780.00 | Paid to Gay Construction Company |
| 05-18-87 | 1,040.00 | Paid for rental property repairs |
| | 1,144.22 | |
| | 3,806.19 | Deposited in Mr. Sutton's NCNB account |
| | 14,610.66 | Nationwide Money Market |
| | 8,746.74 | Nationwide Credit Union |
| | 8,560.38 | Deposited in Mr. Sutton's NCNB account |
| | 10,021.27 | Deposited in Mr. Sutton's NCNB account |
| | 15,134.11 | Deposited in Mr. Sutton's NCNB account |
| | 12,540.54 | |
| | 16,383.00 | |
| | 9,114.63 | Deposited in Mr. Sutton's NCNB account |
| | 614.37 | Cashed |

During the years before the Court, the Suttons paid the following expenses by check or cash:

| | Payee or Item | Amount |
|------|---------------|--------|
| 1986 | Parrott Academy | $4,665.87 |
| | Gay Construction | 2,200.00 |
| | American Express | 1,682.50 |
| | Walnut Creek Country Club | 808.08 |
| | City of Kinston (taxes) | 883.47 |
| | Lenoir County (taxes) | 1,045.39 |
| 1987 | 1987 Chevy | $10,515.00 |
| | 22 ft. boat | 22,000.00 |
| | Ford T-bird | 4,284.00 |
| | Home improvements | 10,502.06 |
| | Jewelry | 4,206.21 |
| | Church sign | 7,030.00 |
| | American Express | 8,334.29 |
| | Parrott Academy | 5,738.33 |
| 1988 | Ford Truck | $11,400.00 |
| | Items for boat | 4,816.59. |

In 1988, the Suttons traded in the boat they had purchased in 1987 for one costing $12,688.08; they also received $9,603.10 in that trade.

Corporate Accounting and Financial Statements

The handwritten green sheets prepared by Mr. Sutton were the

sole record of income for the corporate petitioner.  The totals of sales for each month were totaled at the bottom of the green sheets for that month.  The following column headings appeared on the green sheets:  Date, Register, Food Stamps, Rebates, Cash, Paid Outs, Balance, Cash on Hand, Tax, Deposit, Savings, and Count.[5]  One row of information appeared for each business day of that month.  The green sheets were prepared using the daily cash register reconciliations from one to four cash registers.  However, no register tapes or cash register reconciliations were provided to the accounting firm or submitted into evidence.

According to Mr. Sutton, the figures in the column entitled "Register" represented total sales or gross receipts before coupons were deducted.[6]  The entries under "Cash" represented the sum of "Register" plus "Rebates".  "Paid Outs" were subtracted from "Cash" to arrive at "Balance".  "Cash on Hand" represented actual money, checks, and money equivalents such as vouchers and

---

[5]  There is no explanation in the record as to the last column heading.

[6]  The full price of the grocery item was rung up on the cash register, but then the coupon amount was deducted on the cash register tape.  Without the cash register tapes or the cash register reconciliations, it is not possible to verify whether the total sales or gross receipts figures listed on the green sheets included or excluded coupon amounts.  Since the Court did not find Mr. Sutton to be a credible witness, the Court is unwilling to accord much weight to his self-serving and wholly unsupported testimony.  With a retail grocery business involving a lot of cash receipts and with Mr. Sutton's practice of dealing in cash and failing to distinguish between his pockets and those of his corporation's business, the absence of the cash register tapes is particularly troublesome.

food stamps; i.e., items that can be taken to the bank.[7]
"Deposit" was the deposit made to the corporate petitioner's
checking account; the deposit amounts were usually rounded
figures that did not correlate with the "cash on hand" figures.
"Savings" was used to record taxes such as payroll and sales
taxes accumulated but not yet due to the particular government
agency.  These tax amounts were not necessarily deposited in the
corporate petitioner's savings account on the dates indicated on
the green sheets; some were deposited as much as a month or
longer after the date of the entry on the green sheet.  Examples
of these delayed deposits are:

| Amount | Green Sheet | Deposited |
|---|---|---|
| $3,473.23 | 06-25-88 | 07-27-88 |
| 3,710.84 | 07-02-88 | 07-27-88 |
| 3,582.41 | 07-07-88 | 07-27-88 |
| 3,351.64 | 07-10-88 | 07-27-88 |
| 3,097.63 | 10-01-88 | 03-16-89 |
| 2,768.09 | 11-12-88 | 03-17-89 |
| 2,866.69 | 12-03-88 | 03-31-89 |

Ms. Stroud prepared the corporate petitioner's monthly
financial statements based on the green sheets and the corporate
petitioner's bank statements.  She did not have the cash register
tapes, cash register reconciliations, or the bank deposit slips.
During the process of completing the monthly accounting for the
corporate petitioner, Ms. Stroud contacted Mr. Sutton if she had
any questions.

---

[7] "Cash on hand" did not include coupon amounts or employee
I.O.U.'s for grocery charges that would be deducted from the
employee's paycheck.

Mr. Sutton did not document any funds that he contributed to or that he withdrew from the corporate petitioner. There were no promissory notes, repayments schedules, or other documentation of any loans to or from him. Mr. Sutton did not tell Ms. Stroud about any funds he contributed, other than to answer any specific questions she asked him.

Ms. Stroud would post any deposits Mr. Sutton identified as being from him, as well as any unexplained deposits, as a credit to Account 135-Loan to Shareholder (Account 135). Nearly all of the credits to Account 135 are marked as "deposits". Ms. Stroud would also charge to Account 135 any personal items of the Suttons paid by the corporate petitioner and any unexplained shortages. The following yearend adjusting journal entries were made charging Account 135 in order to reconcile cash on hand to the actual cash balance:

| TYE | Amount |
|-----|--------|
| 09-30-87 | $89,930.05 |
| 09-30-88 | 49,872.72 |
| 09-30-89 | 3,730.00 |
| 09-30-90 | 18,717.41 |

The yearend adjustment for 1987 bears the notation "assumed went to Malcolm Sutton since it did not go to Savings Acct."

The corporate petitioner's unaudited financial statements for October 1, 1985, through September 30, 1989, do not mention any liabilities owed to Mr. Sutton. To the contrary, these financial statements show the following:

| | Loans Receivable | | Loans Payable | |
|---|---|---|---|---|
| TYE | Stockholder | Fred Sutton | Mrs. Sutton | Fred Sutton |
| 09-30-86 | $42,760.61 | $1,000.00 | --- | |
| | $ 1,536.17 | | | |
| 09-30-87 | 136,158.90 | 2,536.17 | $87,964.71 | --- |
| 09-30-88 | 148,637.57 | 2,536.17 | 60,505.01 | 12,000.00 |
| 09-30-89 | 128,877.95 | 2,536.17 | 59,908.40 | 57,000.00 |

The corporate petitioner reported liabilities to commercial lenders on these financial statements.

The corporate petitioner's U.S. Corporation Income Tax Returns show the following amounts at the end of the respective taxable years:

| TYE | Loans to Shareholder | Loans from Shareholder* |
|---|---|---|
| 09-30-86 | $42,760.61 | -0- |
| 09-30-87 | 136,158.90 | $87,964.71 |
| 09-30-88 | 148,637.57 | 60,505.01 |
| 09-30-89 | 128,877.95 | 59,908.40 |
| 09-30-90 | 110,262.77 | 59,908.40 |

*These were actually loans from Mrs. Sutton who was not a shareholder.

The Suttons' North Carolina Intangible Personal Property Tax Returns for the years 1987 through 1990 do not show any loans from Mr. Sutton to the corporate petitioner, nor do they show any loans from the corporate petitioner to Mr. Sutton. Those intangibles returns do reflect a $90,000 loan from Mrs. Sutton to the corporate petitioner; the value of that debt at the end of each year was indicated as:

| Year | Value |
|---|---|
| 1987 | $60,505.01 |
| 1988 | 60,505.01 |
| 1989 | 59,908.40 |

1990        59,908.40

Mr. Sutton signed a personal financial statement for FCB dated April 10, 1986, stating the Suttons' net worth as $588,600. This statement indicates $18,000 in notes due from friends, relatives, or affiliated companies.  Mr. Sutton signed another financial statement for FCB on May 23, 1987, stating the Suttons' net worth as $844,000.  This 1987 statement indicates $27,000 in notes due from friends, relatives, or affiliated companies. Neither financial statement lists any liabilities other than notes payable to banks.

## Federal Income Tax Returns

The Woolard & Hale firm prepared the tax returns of the corporate petitioner and the Suttons for the years at issue.  The corporate petitioner's Federal income tax returns for taxable years ending September 30, 1987, and September 30, 1988, were due, under extension, and filed on the following dates:

| Taxable Year Ending | Due | Filed |
|---|---|---|
| September 30, 1987 | June 15, 1988 | June 15, 1988 |
| September 30, 1988 | June 15, 1989 | February 9, 1989 |

Respondent determined in the notice of deficiency to the corporate petitioner that the extensions for those years were invalid, since the balance due was materially understated.

The Suttons' Federal income tax returns for 1987 through 1990 were due, under extension, and filed on the following dates:

| Year | Due | Filed |
|------|-----|-------|
| 1987 | October 17, 1988 | December 5, 1988 |
| 1988 | October 15, 1989 | November 13, 1989 |
| 1989 | October 15, 1990 | August 30, 1991 |
| 1990 | August 15, 1991 | August 15, 1991 |

Respondent determined in the notice of deficiency to the individual petitioners additions to tax for delinquency computed without regard to the extensions of time.

Petitioners relied almost entirely on their accountants for purposes of taking care of the corporate petitioner's monthly and yearly books and financial records, and corporate and personal tax returns. For the corporate petitioner, Ms. Stroud relied upon the green sheets prepared by Mr. Sutton and the corporate bank statements. It is not clear what materials the individual petitioners furnished to Ms. Stroud for the preparation of their individual tax returns. However, Ms. Stroud did not have the Suttons' personal bank statements when she prepared their returns.

Respondent's Determinations

The Corporate Petitioner

Respondent reconstructed the corporate petitioner's income for its taxable years ended September 30, 1987 through 1990, based on the accounting and bank records that were available. Revenue Agent Joseph Board (Mr. Board) compiled a list of specific unexplained bank deposits for the corporate petitioner's taxable years ended September 30, 1987 through 1989. Those

unexplained deposits do not include the store deposits.

Respondent adjusted the corporate petitioner's income as follows:

| | | Taxable Year Ending | | | |
|---|---|---|---|---|---|
| Item | 9/30/86 | 9/30/87 | 9/30/88 | 9/30/89 | 9/30/90 |
| Purchase Rebates | | $16,007 | $24,308 | $8,056 | $20,561 |
| Gross Receipts | | 41,039 | 180,913 | 41,220 | 73,608 |
| Contributions | | (1,320) | (1,247) | (843) | (728) |
| NOL Deduction | $35,851 | | | | 5,909 |

Respondent has since conceded the amounts of those rebate checks that were credited to the corporate petitioner's accounts payable at the respective vendors, where net costs were used in calculating cost of sales, and has conceded some receipts. The amounts of respondent's concessions are (rounded to the nearest dollar):

| | Taxable Year Ending | | | |
|---|---|---|---|---|
| Item | 09-30-87 | 09-30-88 | 09-30-89 | 09-30-90 |
| Rebates and coupons | $2,988 | $1,625 | $2,964 | $5,050 |
| Gross receipts | -0- | 46,413 | 5,987 | -0- |

### The Suttons

Mr. Board examined the Suttons' bank records and compiled a list of specific unexplained deposits which respondent included in the Suttons' income. The yearly totals of these unexplained deposits to the Suttons' personal bank accounts over the 5-year period are:

| Year | Amount | Number of Deposits |
|------|--------|--------------------|
| 1986 | $63,008 | 51 |
| 1987 | 83,403 | 52[+] |
| 1988 | 53,550 | 35[+] |
| 1989 | 60,541 | 25 |
| 1990 | 62,650 | 57 |

Respondent also included the amounts of all rebate and coupon checks issued to the corporate petitioner that were not accounted for in the corporate petitioner's income.  Respondent since has conceded amounts representing such rebate/coupon checks that were shown to have been deposited in the corporate petitioner's bank account.  Other adjustments are reflected in the concessions listed below.

Respondent has conceded (rounded to the nearest dollar) the following:

| Item | 1986 | 1987 | 1988 | 1989 | 1990 |
|------|------|------|------|------|------|
| Rebate/coupons | $3,593 | $6,369 | $20,935 | $7,597 | $18,054 |
| Annuity | | | 13,067* | | |
| IRA Distribution | | | 14,337* | | |
| Interest Income | | | 239* | | |
| Dividend Income | | | 140* | | |
| Tax on IRA | | | 1,434 | | |
| Dependency Exemption | 1,080 | 1,900 | 1,950 | | |

*Respondent concedes those items because the Suttons had already conceded them during the audit, and those items should not have been included in the notice of deficiency.

The Suttons have conceded that they failed to report on their individual income tax returns the following:

| Item | 1986 | 1987 | 1989 |
|------|------|------|------|
| Dividend Income | $180 | $120 | --- |

| | | | |
|---|---|---|---|
| Capital Gain | 65 | --- | --- |
| Annuity Received by Mrs. Sutton | --- | 13,065 | $13,068 |
| Inherited IRA | --- | 23,579 | --- |
| Interest Income | --- | 605 | --- |

OPINION

**The Corporate Petitioner**

Rebate and Coupon Checks

The corporate petitioner acknowledges that rebates are to be considered in calculating its income.  In some instances, the corporate petitioner recorded rebates as a reduction to cost of sales and in other instances, where rebates had been credited against amounts owed to wholesalers, the corporate petitioner reflected the net costs.  Respondent agrees with that treatment.  To the extent, however, that the proceeds of rebate checks were not accounted for by either of those methods, we hold that the corporate petitioner had unreported income from rebate checks.[8]  In other words, if the rebate checks did not in some way reduce cost of sales, then the cost of sales was overstated, and the gross income was correspondingly understated.

The parties also agree that the coupons result in income; they disagree, however, as to the proper treatment of that income.  Respondent has determined that the corporate

---

[8] Petitioners have speculated that some rebate checks may have been rung up on the register, thereby being included in income twice, once in cash register gross receipts and again as a result of reducing cost of sales as a rebate.  Petitioners have not established any such instances.

petitioner's income should be increased by the amounts of those coupon checks not previously recorded in the corporate petitioner's books as rebates. The corporate petitioner argues that the value of the coupons was included in income as a component of gross receipts and, therefore, should not be included again upon receipt of the coupon checks. The corporate petitioner has failed to establish the factual predicate for its argument. We cannot find that the coupon amounts were initially included in the gross receipts ("register") figures on the green sheets.

No cash register tapes or reconciliation records were submitted. The amount of income received from coupons was not accounted for as a separate item on the corporate petitioner's green sheets or any other books or records. Accounting practices were inconsistent, some coupon checks being recorded as rebates on the green sheets. Ms. Stroud from the accounting firm knew nothing of the accounting procedures for coupons or coupon checks. The corporate petitioner has not met its burden of showing respondent's determination to be incorrect. Therefore, we sustain respondent's determination, as adjusted by respondent's concessions, which are detailed in the Findings of Fact above.

Unexplained Bank Deposits

Every person liable for tax is required to keep books and

records sufficient to establish the amount of such taxpayer's income. Sec. 6001; <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Where a taxpayer fails to maintain adequate books or records, the Commissioner may determine the taxpayer's income by, among other methods, the bank deposits method. <u>Mallette Bros. Construction Co. v. United States</u>, 695 F.2d 145 (5th Cir. 1983); <u>DiLeo v. Commissioner</u>, <u>supra</u>. Bank deposits are prima facie evidence of income. <u>Mills v. Commissioner</u>, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967-67; <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994); <u>DiLeo v. Commissioner</u>, <u>supra</u> at 868. The taxpayer has the burden of proving that the Commissioner's determination is incorrect. Rule 142(a); <u>Mills v. Commissioner</u>, <u>supra</u> at 749; <u>Clayton v. Commissioner</u>, <u>supra</u> at 645.

The corporate petitioner argues that its unexplained bank deposits consist entirely of funds advanced by Mr. Sutton to provide the corporate petitioner with sufficient working capital. The corporate petitioner includes in these funds cash loans Mr. Sutton allegedly received from Mr. Palmer. The Court is not persuaded that Mr. Palmer made any loans to Mr. Sutton, let alone that such "loans" account for the corporate petitioner's unexplained bank deposits. The corporate petitioner asserts that the proceeds of all of Mr. Sutton's personal checks to the corporate petitioner that were cashed eventually ended up as

deposits.  On the whole, that has not been established.

The totals of the personal checks Mr. Sutton wrote to or on behalf of the corporate petitioner are summarized in the Findings of Fact above.  However, most of the personal checks that were deposited were part of the store deposits and, thus, do not reduce the corporate petitioner's unexplained bank deposits. Those checks that were deposited separately from the store deposits and that do not constitute income to the corporate petitioner are listed separately in the Findings of Fact above.

As for the proceeds of personal checks that were cashed, Mr. Sutton could not remember their specific disposition and, thus, could not correlate their proceeds to the unexplained bank deposits.  Checks written to third parties do not explain bank deposits.  There is no credible evidence of any cash contributions from Mr. Sutton to the corporate petitioner, either from any of his personal funds or from any funds deriving from Mr. Palmer.

Both the corporate petitioner and the individual petitioners allege that Mr. Sutton loaned small amounts to the corporate petitioner regularly and withdrew small amounts regularly, in essence, alleging that the same funds were loaned and repaid over and over.  They argue that respondent has distorted the corporate petitioner's income by summing the amounts advanced without subtracting the repayments.  Petitioners point to Ms. Stroud's

reconciliations as reflecting the net effect to the corporate petitioner and thus a more accurate picture.

On the contrary, Ms. Stroud's knowledge of these alleged loan transactions was limited, restricted by Mr. Sutton himself. The failure to document these transactions must weigh against petitioners. We have considered all deposits attributable to Mr. Sutton to the extent made possible by the record before us.

The parties have stipulated that Mrs. Sutton loaned a total of $100,000 to the corporate petitioner during 1987; yet, we are unable to ascertain whether the last $10,000 installment was ever deposited in the corporate bank account. Similarly, Fred Sutton provided funds to the corporate petitioner. However, the Fred Sutton checks were included in the store deposits in part. The remaining Fred Sutton funds (the August 19, 1988 check for $10,000) were conceded by respondent. Therefore, the Fred Sutton funds do not assist in reducing the remaining unexplained bank deposits.

However, the delayed deposits to the corporate petitioner's savings account for taxes, as described in the Findings of Fact above, do serve to account for unexplained deposits on March 16, 17, and 31, 1989. Also, respondent listed an unexplained deposit of $14,000 on July 27, 1988. For that date, the corporate petitioner's bank statement shows a withdrawal of $14,000 and a deposit in the amount of $14,118.12. The latter deposit

represents the total of four delayed savings deposits, also detailed in the Findings of Fact above. The unexplained bank deposits should be reduced by those amounts.

Both the corporate petitioner and the individual petitioners argue that the proceeds of the rebate and coupon checks that were cashed ended up in the corporate petitioner's bank deposits and have been included by respondent in income twice. Other than self-serving speculation, petitioners have not provided any information as to the disposition of these cashed checks. Such cash proceeds may have been part of the store deposits and already excluded from the unexplained bank deposits. Since we are unable to determine how much, if any, was deposited and unable to distinguish such cash from the other items deposited, we cannot find as fact that the proceeds of these cashed rebate and coupon checks were included in the unexplained bank deposits. However, there is evidence of the August 30, 1988, deposit of the $502.44 check from Quinn within an unexplained deposit of $1,000 on that day, and the corporate petitioner's income should be adjusted accordingly.

Additions to Tax under Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful

neglect. This addition to tax is 5 percent of the tax required to be shown on the return per month of such failure, up to 25 percent. Sec. 6651(a)(1). Respondent has determined that the corporate petitioner's extensions of time to file for taxable years ending September 30, 1987 and 1988 were invalid and that the corporate petitioner is liable under this section.

The corporate petitioner asserts that the extensions for both years were valid, but offers no proof and no argument other than that respondent did not prove the extensions to be invalid. The corporate petitioner has the burden of proof to show the additions are improper. United States v. Boyle, 469 U.S. 241, 245 (1985); Funk v. Commissioner, 687 F.2d 264, 266 (8th Cir. 1982), affg. T.C. Memo. 1981-506. The Commissioner may void an extension where the taxpayer's request for extension is invalid because of a failure to properly estimate tax liability. Crocker v. Commissioner, 92 T.C. 899, 911 (1989). The corporate petitioner has not shown it made a bona fide and reasonable estimate of its tax liability at the time the requests for extension were made. We hold for respondent on this issue.

Additions to Tax and Penalties for Negligence

Respondent has determined that all of the corporate petitioner's underpayments for the years at issue were due to negligence or disregard of rules or regulations and imposed an

addition to tax or penalty for each year.[9]  In contesting these additions and penalty, the corporate petitioner relies primarily on its position that no deficiency exists, but does argue that any deficiency due to unreported rebates was due to Mr. Sutton's lack of education and understanding of accounting practices.

Negligence is the lack of due care or the failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).  For purposes of the accuracy-related penalty under section 6662, the term "negligence" also includes any failure to make a reasonable attempt to comply with the Internal Revenue Code, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  We find the corporate petitioner to be negligent in its failure to maintain full and accurate records of its financial transactions during the years at issue.  Mr. Sutton failed to disclose fully to Ms. Stroud the information she needed to keep proper records and file accurate returns.  Reliance on her was not reasonable.  Ma-Tran Corp. v. Commissioner, 70 T.C.

---

[9] The additions to tax and penalty are under the following sections:

| TYE | Sections |
| --- | --- |
| 09-30-86 | Sec. 6653(a)(1) and (2) |
| 09-30-87 | Sec. 6653(a)(1)(A) and (B) |
| 09-30-88 | Sec. 6653(a)(1)(A) and (B) |
| 09-30-89 | Sec. 6653(a)(1) |
| 09-30-90 | Sec. 6662(a) |

158, 173 (1978). We sustain respondent's determination that the corporate petitioner was negligent with respect to its underpayments.

### Addition to Tax under Section 6661

Respondent has determined an addition to tax under section 6661 for substantial understatement of tax for the corporate petitioner's taxable year ended September 30, 1988. This addition applies when the understatement of income tax of a corporate taxpayer exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year, or (2) $10,000. Sec. 6661(b)(1). The understatement for purposes of this addition shall be reduced where there is substantial authority for the tax treatment of any item or if there was adequate disclosure, in or attached to the return, of the relevant facts affecting any item. Sec. 6661(b)(2)(B).

The corporate petitioner has presented no argument in objection to this addition. Since the amount of the understatement for the taxable year ended September 30, 1988, is substantial, we sustain respondent's determination on this issue.

## The Suttons

### Rebate and Coupon Checks

Respondent contends that Mr. Sutton diverted the proceeds of the cashed rebate and coupon checks from the corporate petitioner, thereby receiving constructive dividends. Petitioners allege that

all of the proceeds were used by the corporate petitioner, but argue that if any such proceeds are found to be used by the Suttons, such funds should be characterized as repayments of loans Mr. Sutton made to the corporate petitioner.

Some of the proceeds of these cashed checks were deposited into the Suttons' personal bank account. It is not known what happened to the remainder. On the record before us, we conclude that Mr. Sutton retained these funds for his personal use. Rule 142(a).

Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of its earnings and profits. When a shareholder receives an economic benefit from the corporation without an expectation that that benefit be repaid, the shareholder has received a constructive dividend. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306. However, where a shareholder has made a loan to the corporation, the corporation's repayment of that loan would not be taxable to the shareholder. Theodore v. Commissioner, 38 T.C. 1011, 1040-1041 (1962).

In order for any monies that Mr. Sutton may have retained from these cashed rebate and coupon checks to be repayments from the corporate petitioner to Mr. Sutton, there must have been a bona fide loan from Mr. Sutton to the corporate petitioner.

Donisi v. Commissioner, 405 F.2d 481 (6th Cir. 1968), affg. T.C. Memo. 1967-62. Whether a transaction between a shareholder and his closely held corporation represents a bona fide indebtedness must be determined based on the facts and circumstances surrounding the transaction. Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). The shareholder's mere statement that he considered the distributions to be repayments of loans is not sufficient to show that the intrinsic economic nature of the transactions themselves is that of a debt rather than a constructive dividend. Williams v. Commissioner, supra; Alterman Foods, Inc. v. United States, 505 F.2d 873, 876-877 (5th Cir. 1974); Cordes v. Commissioner, T.C. Memo. 1994-377.

The only records of funds transferred between Mr. Sutton and the corporate petitioner were the limited books of the corporate petitioner; i.e., the financial statements and the corporate tax returns. These records indicated that Mr. Sutton owed the corporation for funds loaned to him, not vice versa. Ms. Stroud recorded any bank deposits identified as advances from Mr. Sutton as reductions in what Mr. Sutton owed the corporate petitioner, not as loans from him. There were no promissory notes, repayment schedules, interest charges, or other credible evidence of any loans from Mr. Sutton to his corporation. It follows that the cash proceeds of the rebate and coupon checks were constructive

dividends to Mr. Sutton.  Donisi v. Commissioner, supra; Cordes v. Commissioner, supra.

Unexplained Bank Deposits

Mr. Sutton argues that the unexplained bank deposits in his personal bank account consist of repayments of his loans to the corporate petitioner, the proceeds of checks cashed by the store, loans from Mr. Palmer, and cash distributions from the estate, all of which would be nontaxable sources.  The factual predicate for that argument has not been established.

We cannot find that Mr. Sutton made any loans to the corporate petitioner.  Thus, any payments out of the corporation to him cannot be repayment of loans.  Ms. Stroud's entries to Account 135 support respondent's position, indicating that Mr. Sutton withdrew greater amounts of money than any amounts he may have contributed.  Mr. Sutton has not argued that the funds he withdrew from the corporate petitioner were intended to be loans from the corporate petitioner.  See Alterman Foods, Inc. v. United States, supra at 877 n.7.  We conclude that any funds that Mr. Sutton withdrew from the corporate petitioner were constructive dividends.[10]

We are unable to attribute any of the unexplained bank deposits in the Suttons' bank accounts to the proceeds of personal

[10] Petitioners have not presented argument or proof that any distributions would be nontaxable due to the limitations of the corporate petitioner's earnings and profits.

checks cashed by the corporate petitioner, since we cannot distinguish checks that may have been handled in this fashion. We cannot find that the Suttons received any funds from Mr. Palmer. We have found that the Suttons received funds from the estate; yet, we are unable to trace such funds to the remaining unexplained bank deposits in the Suttons' personal bank account. In summary, petitioners have failed to prove that any of the Suttons' unexplained bank deposits derived from nontaxable sources.

The individual petitioners argue that they should not have to include the proceeds of the cashed rebate and coupon checks in addition to the unexplained bank deposits, as this would be double counting. Since the disposition of the cash proceeds is unknown, we cannot find that they were part of the unexplained bank deposits.

### Additions to Tax under Section 6651

Respondent has determined additions to tax for late filing for the Suttons' taxable years 1987 through 1990. The Suttons applied for extensions in each of these years and, for years 1987 through 1989, filed their returns after the respective due dates as extended. They admit that the returns for 1987 through 1989 were filed after the due dates as extended, and if a deficiency should be found for any of these years, that some addition would apply for each of those years. However, they assert that the

extensions for 1987 though 1990 were valid and argue that the addition should only apply from the respective due dates as extended.

The Suttons have not shown they made a bona fide and reasonable estimate of their tax liability at the time the requests for extension were made.  We hold for respondent on this issue.

### Additions to Tax and Penalties for Negligence

Respondent has determined that all of the Suttons' understatements for the years at issue were due to negligence or disregard of rules or regulations.[11]  The individual petitioners have argued only that they correctly reported their income and were not otherwise negligent.  We disagree.  They have presented no specific evidence that they acted as would a reasonable and ordinarily prudent person under the circumstances.  We sustain respondent on the negligence issue.

### Addition to Tax under Section 6661

Respondent has determined additions to tax for substantial

---

[11] The additions to tax and penalties are under the following sections:

| Year | Sections |
|------|----------|
| 1986 | Sec. 6653(a)(1)(A) and (B) |
| 1987 | Sec. 6653(a)(1)(A) and (B) |
| 1988 | Sec. 6653(a)(1) |
| 1989 | Sec. 6662(a) |
| 1990 | Sec. 6662(a) |

underpayment for the Suttons' taxable years 1986 through 1988.  An understatement of tax by an individual taxpayer is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1)(A).

The Suttons have presented no arguments on this issue other than to deny the underlying deficiencies.  We sustain respondent as to the additions under section 6661.

In keeping with the above and the concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>